IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| BIJU MUKRUKKATTU JOSEPH, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civ. No.  1:13-cv-00324-RC-ZJH |
| | ) | |
| SIGNAL INTERNATIONAL LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## RESPONSE OF PLAINTIFFS TO BURNETT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

Daniella D. Landers (Texas Bar No. 24026260)
Sutherland Asbill & Brennan LLP
1001 Fannin Street, Suite 3700
Houston, Texas  77002-6760
Telephone:  (713) 470-6100
Facsimile:  (713) 654-1301

John H. Fleming
Keith J. Barnett
Gabriel A. Mendel
Kurt Lentz
Kara D. Duffle
Teresa L. Sulmers
(admitted by *pro hac vice*)
Sutherland Asbill & Brennan LLP
999 Peachtree Street, NE, Suite 2300
Atlanta, Georgia  30309-3996
Telephone:  (404) 853-8000
Facsimile:  (404) 853-8806
***Attorneys for Plaintiffs***

**Table of Contents**                                                         **Page**

**I. FACTUAL AND PROCEDURAL BACKGROUND** ............................................................2

    A.  The Defendants' Scheme ................................................................2

    B.  Burnett's Role in the Scheme ........................................................3

    C.  The *David* Case ............................................................................8

    D.  The *Joseph* Lawsuit ......................................................................9

**II. LEGAL ARGUMENT**..........................................................................................9

    A.  Standard of Review......................................................................9

    B.  Plaintiffs Have Stated Their Federal Claims Against Burnett with Great
        Specificity ..............................................................................10

    C.  Plaintiffs' Claims Do Not Depend on Threats of Deportation Against Illegal
        Immigrants Equating to Involuntary Servitude......................................11

    D.  The Court Should Consider the Statute of Limitations for Common Law
        Claims to Have Been Tolled ...........................................................13

**III. CONCLUSION**....................................................................................................18

## Table of Authorities

**Page(s)**

**Cases**

*American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974).....................................13, 14, 15, 16, 17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................................. 9

*Bara v. Major Funding Corp. Liquidating Trust*, 876 S.W.2d 469 (Tex. App. – Austin 1994) ......................................................................................................... 13-14

*Beavers v. Metropolitan Life Ins. Co.*, 2007 WL 3342540 (S.D. Tex. Nov. 8, 2007)..................14

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................................9

*Bell v. Showa Denko K.K.*, 899 S.W.2d 749 (Tex. App. – Amarillo 1995)......................14, 15-16

*Castellanos-Contreras v. Decatur Hotels, LLC*, 622 F.3d 393 (5th Cir. 2010) ...........................13

*David v. Signal International, LLC*, 2012 U.S. Dist. LEXIS 114247 (E.D. La. Jan. 4, 2012) ................................................................................................ 8, 14-15, 17

*Grant v. Austin Bridge Construction Co.*, 725 S.W.2d 366 (Tex. App. – Houston [14th Dist.] 1987) ..................................................................................................14, 16

*Hall v. Variable Annuity Life Ins. Co.*, 2013 WL 4233103 (5th Cir. Aug. 15, 2013) .................15

*Newby v. Enron Corp.*, No. H-01-3624 (S.D. Tex. Nov. 29, 2006) ..............................................17

*Newby v. Enron Corp.*, 542 F.3d 463 (5th Cir. 2008)........................................................14, 16-17

*In re Norplant Contraceptive Products Liability Litigation*, 961 F. Supp. 163 (E.D. Tex. 1997) .................................................................................................................14

*Ventura v. Banales*, 905 S.W.2d 423 (Tex. App. – Corpus Christi 1995)....................................13

*Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527 (3d Cir. 2012) ................................................11, 12

**Statutes and Rules**

18 U.S.C. §§ 1589, 1590, Trafficking Victims Protection Reauthorization Act of 2003..........8, 10

18 U.S.C. §§ 1961-1968, Racketeer Influenced & Corrupt Organizations Act.................... *passim*

29 U.S.C. § 203, Fair Labor Standards Act ........................................................................8, 12, 13

42 U.S.C. § 1981, Civil Rights Act of 1866 .....................................................................................8

Fed. R. Civ. P. 12(b)(2)......................................................................................................................9

Fed. R. Civ. P. 12(b)(6)........................................................................................................1, 9, 18

Defendants Malvern C. Burnett, The Law Offices of Malvern C. Burnett, A.P.C., and Gulf Coast Immigration Law Center, L.L.C. (collectively "Burnett") have moved to dismiss the Amended Complaint (the "Complaint") under Fed. R. Civ. P. 12(b)(6) as against Burnett for alleged failure to state a claim.  Burnett alleges three principal grounds, as to different counts, all of which grounds are fatally flawed.

(1)     Burnett contends that Plaintiffs' allegations against Burnett contain mere conclusions, without specificity.  Burnett however, ignores the very detailed specific allegations against Burnett contained in the RICO Fraud Chart attached to and incorporated into the First Amended Complaint, which amply satisfy the relevant pleading standards.

(2)     Burnett contends that the federal claims, including RICO claims asserted against Burnett, rest "almost entirely" on the allegedly erroneous conclusion that being required to work under the threat of deportation constitutes involuntary servitude.  That is simply false – the coercive threat that Plaintiffs would be sent back to India was one of many circumstances constituting the wrongful acts in this case.  And Burnett's citation of a case involving illegal immigrants, who lived on their own with no restraints, has no application here.

(3)     Burnett contends that as to the common law causes of action, the statutes of limitation have lapsed, because they were not tolled based on the putative class action filed in the *David* case, as to which class certification was ultimately denied.  Burnett is again incorrect. *David* presented the same federal and common law claims presented here, against the same defendants on behalf of a specified putative class of 590 individuals which included these Plaintiffs.  In this situation, unlike those cited by Burnett, Texas courts would almost surely recognize tolling of the statutes as to the common law claims.  Tolling is particularly appropriate

because the court in *David* has expressly found that the limitations periods, for federal and state claims, should be tolled through the date of that court's recent order.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

The facts recited herein are taken from the allegations of the Complaint (ECF No. 19) and the RICO Fraud Chart, Ex. 1 thereto (ECF No. 19-1) incorporated into the Complaint by reference and largely ignored in Burnett's Motion.

## A.      The Defendants' Scheme

Burnett was a principal participant in a substantial and extremely destructive (to Plaintiffs) trafficking scheme planned and executed among the Defendants.   The ultimate purposes of the scheme, as all participants including Burnett were aware, were to make misrepresentations to Plaintiffs and others like Plaintiffs about the immigration status they could expect on coming to work for Signal in the United States, to extract large sums of money from Plaintiffs and the others on that basis, and then for Signal to exploit high skill, low pay labor from Plaintiffs while they lived in deplorable conditions.   Compl. ¶¶ 1-4, ECF No. 19.   Plaintiffs were required to pay Signal room and board for those deplorable conditions in Texas.   As all Defendants were aware, Plaintiffs were essentially enslaved in Texas because the H-2B visas Burnett helped Signal arrange for permitted Plaintiffs only to work for Signal.   *Id.* ¶¶ 4, 142, 228, 251.   Additionally, because of the substantial debts Plaintiffs incurred in paying Burnett and other Defendants based on false promises, Plaintiffs were not free simply to go back to India – they had to work to try to pay off their debts.   *Id.*

The lies Burnett and other Defendants told Plaintiffs included promises that Plaintiffs would receive green cards for permanent residence in the United States, either right away or after

traveling to the U.S. on an H-2B visa, and that green cards would also be made available to their families.  *Id.*

As Burnett and the other agents of Signal and conspirators were aware, the treatment of Plaintiffs by Signal at the Orange, Texas facility and man camp was absolutely inhuman. Plaintiffs were forced to live 24 men to a small trailer, with only one or two toilets and often rancid food.  *Id.* ¶¶ 204-216.   The camps were located in an isolated area removed from shopping, places of worship and residential communities, and was fenced and monitored by security guards.  *Id.*  The food, available only at limited times, was ill-prepared and unhygienic, resulting in frequent illness.   *Id.*   In the work place these Indian national Plaintiffs were discriminated against based on ethnic origin, given more difficult work than others when work was available, and less work (so less pay) when it was not.  *Id.* ¶¶ 217-218, 347-349.

## B.     Burnett's Role in the Scheme

Burnett in this Motion contends that the Complaint presents only "unsupported and unsupportable conclusions and talismanic recital of statutory language" as to Burnett.  (Burnett's Motion, p. 2, ECF No. 32.)  On the contrary, the Complaint, and particularly the incorporated RICO Fraud Chart, include numerous very specific and detailed allegations of the very prominent role of Burnett (defined as "the Legal Facilitator Defendants" in the Complaint) in this illegal enterprise.  (Compl. ¶¶ 20, 21, 23, 28, 30-32, 34, 35, 37-44, 46-54, 56, 58-60, 62, 103, 111, 152, ECF No. 19; Compl. Ex. 1 ¶¶ F25, F31, F32, F35, F52, F54, F59, F70, F72, F81, F87, F88, F90, F94, F102, F103, F108, F109, F113, F118, F120, F121, F123, F126, F129, F132, F135,  F136, F139, F140, F144, F151, F152, F160, F169, F173, F178, F184, F190, F195, F197, F228, F231, F240, F245, F246, F272, F285, F289, F300, F302, F318, F327, F408, ECF No. 19-1.)  Burnett was quite important to the success of the fraud, being the American lawyer who

3

spoke to recruits in India and the UAE to put a patina of legal legitimacy under U.S. law on what was in fact a massive and illegal scam.  Burnett had conversations directly with many of these Plaintiffs in which he represented that they would become eligible for green cards, when he in fact knew very well that as recipients of H-2B visas they would in fact not be eligible for green cards.  *Id.*

Burnett concedes that in participating in this program he was purportedly "represent[ing] both the non-immigrant visa applicant . . . and the United States employer [Signal]."  (Burnett Motion, p. 4.) The Complaint specifically alleges that Burnett was lying to his Indian worker clients, both to unfairly extract large sums of money from them and to facilitate their trafficking by Signal to Texas, where Signal would exploit and abuse them inexcusably.

The very detailed RICO allegations (Compl. Ex. 1 ¶¶ F25, F31, F32, F35, F52, F54, F59, F70, F72, F81, F87,  F88, F90, F94, F102, F103, F108, F109, F113, F118, F120, F121, F123, F126, F129, F132, F135,  F136, F139, F140, F144, F151, F152, F160, F169, F173, F178, F184, F190, F195, F197, F228, F231, F240, F245, F246, F272, F285, F289, F300, F302, F318, F327, F408) note the participation of Burnett – the Legal Facilitator Defendants – in numerous activities comprising the predicate acts.   And the RICO Fraud Chart gives many specific examples of Burnett promoting the fraudulent scheme in particular interactions with these Plaintiffs.  By way of example only:

- In the fall of 2003, Burnett and other Defendants met with Plaintiff Vavachan Mathai Koottalil, who had responded to an advertisement for shipyard workers to work in the U.S., and informed Koottalil that he and that his wife could also come to the U.S. and work, that it would be an 18-month process and that Koottalil would be able to bring his family. (Compl. Ex. 1 ¶¶ F34, F35.)

4

- In 2004, Burnett and another Defendant met with Plaintiff Joy Joseph Attayil, who had responded to an advertisement offering to provide a process for a permanent green card and arrange to bring his family, and told Attayil that he would be working for a company called J&M.  (*Id*. ¶¶ F53, F54.)

- In 2004, Burnett and other Defendants met with Plaintiff Suresh Kakkoth, who had responded to an advertisement stating there was an opportunity to work in the U.S. and get a green card, and told Kakkoth that he would work for Indo-AmeriSoft and that he would be put on a fast track for a visa that would allow him to live permanently in the U.S. with his family.  Kakkoth paid Burnett a "processing fee" of 4,500 dirhams.  (*Id*. ¶¶ F57, F59.)

- In 2004, Burnett and other Defendants met with Plaintiff Varghese Pappachan, who had responded to an advertisement offering "best opportunity within the US with a green card," and told Pappachan that told it would cost 7 lakh rupees to participate in the program, to be paid in three installments.  Pappachan was told that this would cover the cost of the visa.  Pappachan paid Burnett the dollar equivalent of 55,000 rupees in cash.  (*Id*. ¶¶ F68, F70, F71.)

- In mid-January 2004, Burnett met with Plaintiff Biju Mukrukkattu Joseph and told Joseph that within 18 months Joseph could get a green card. (*Id*. ¶ F87.)

- In mid-January 2004, Burnett and other Defendants met with Plaintiff Babu Lal Mali, who had responded to an advertisement offering opportunities for shipyard and skilled workers in the U.S. on a permanent residency/green card, and promised Mali that within a year of his arrival in the U.S., Indo-Ameri Soft would obtain a green card for Mali.  (*Id*. ¶¶ F14, F88.)

- In April 2004, Burnett and other Defendants met with Plaintiff Omanakutta Govindan Kakkanthara, who had responded to an advertisement offering an opportunity to get a green card in the United States, and told Kakkanthara that he could go to the U.S. with a green card, that it would take 18 to 24 months, that he would have to pay a total of 6 lakh rupees, and that he could bring his family.  (*Id.* ¶¶ F106, F109.)

- In May 2004, Burnett and other Defendants met with Plaintiff Kunhikrishn Kaniyamkulam Veetil and promised Veetil a green card within 18 months.  Veetil paid Burnett $1222. (*Id.* ¶ 118.)

- In May 2004, Burnett and other Defendants told Plaintiff Pankajakshan Madhavan that if he provided his passport they would file his immigration paperwork and that he would have to make a series of payments of 59,000 rupees each to Burnett and two other Defendants.  Madhavan gave Burnett his passport. (*Id.* ¶ 120.)

- On May 27, 2004, Plaintiff Haridas Sankara Panicker paid $1217 via check to Burnett and received a receipt stating the payment was "Advance fees for the process of Permanent Residence Visa." (*Id.* ¶ 123.)

- In June 2004, Burnett and another Defendant met with Plaintiff Sojan Paul Kaliyadan, who had responded to an advertisement offering construction work in the U.S., and told Kaliyadan that he would get a green card in the U.S. as a result of the process, but would have to pay. Kaliyadan made his first payment of approximately 165,000 Indian rupees with a portion to Burnett by banker's check in dollars and the remainder to two other Defendants.  (*Id.* ¶¶ F91, F129.)

- In November 2004, Burnett and other Defendants met with Plaintiff Suresh Kumar Pillai Kavalamkuzhi, who quit his job in Azerbaijan to respond to an advertisement offering opportunities for welders and pipefitters to go to the U.S. with permanent residency, and told Kavalamkuzhi that he would eventually be able to bring his family over from India, that he would be working for a company called J&M, and that the visa process would take up to two years. Kavalamkuzhi was asked to pay three installments of 66,000 rupees each (approximately $1400 each).  Kavalamkuzhi paid 60,000 rupees in a draft to Burnett.  (*Id.* ¶¶ F141, F144.)

- In December 2004, Burnett and other Defendants met with Plaintiff Eswara Kannithi, who had responded to an advertisement for welders, structural fitters, fabricators and marine engine fitters, offering a green card and "permanent lifetime settlement in U.S.A. for self and family," and told Kannithi he would get a green card and could take his family along.  (*Id.* ¶¶ F148, 151.)

- In December 2004, Burnett and other Defendants met with Varghese Devassy, who had responded to an advertisement offering an opportunity to get a green card in the U.S., and told Devassy that to get to the U.S. on a permanent visa/green card, with your family, there were three steps: (1) labor certification, (2) I-140, (3) 485, there would be fees at each step, and a total of 6 lakh rupees would have to be paid.  Devassy paid 50,000 rupees to Burnett via bank draft. (*Id.* ¶¶ F149, 152, 155.)

- In April 2005, Burnett and other Defendants met with Phillip Baby, who had responded to an advertisement offering facilitation of a permanent visa/green

card, and told Baby the requirement of three payments of 6 lakh and promised permanent resident status or a green card.  (*Id*. ¶¶ F153, 173.)

Burnett continued to make misrepresentations to these Plaintiffs in communications with them while they were at the Texas facility, living in deplorable conditions.   Compl. Ex. 1 ¶¶ F404-F463.  He visited the Texas facility, apparently twice, by his own admission, and Plaintiffs recall him being there.  *Id.*  Burnett at all times has been well aware of the damage he and the other Defendants inflicted on these Plaintiffs, culminating in their many months of essential enslavement in Texas.

**C.**     **The *David* Case**

Having finally extracted themselves from the clutches of Signal and their purported attorney, Mr. Burnett, twelve of the Indian workers, mostly from Mississippi but including Texas workers, filed a putative class action lawsuit in the Eastern District of Louisiana, asserting claims under various federal statutes (trafficking (18 U.S.C. §§ 1589, 1590), RICO (18 U.S.C. §§ 1961-1968), Civil Rights statutes (42 U.S.C. § 1981), and FLSA (29 U.S.C. § 203)) along with common law claims for fraud, negligent misrepresentation and breach of contract.  The Signal Defendants were able to persuade the Court that individual issues predominated, at least as to the non-FLSA claims, and so class certification as to all the other claims was denied, meaning that these Plaintiffs and numerous other trafficked Indian workers would need to file individual cases to preserve their claims.  *David, et al. v. Signal Int'l, LLC*, 2012 U.S. Dist. LEXIS 114247 (E.D. La. Jan. 4, 2012).  Judge Morgan on August 28, 2013 issued an order (attached hereto as Exhibit A) granting the *David* plaintiffs' motion that the statutes of limitations for all claims, both federal and state, should be tolled for the putative class members not named in the *David* complaint (which include these forty-five *Joseph* Plaintiffs) through the date of her order.

**D.      The *Joseph* Lawsuit**

This lawsuit was filed in May of this year, originally on behalf of thirty-three trafficked Indian workers who were recruited by Burnett, Dewan Consultants, Indo-Amerisoft and/or J&M, Signal and others on the basis of misrepresentations and crimes as described above, and trafficked into Signal's Orange, Texas facility.  The Complaint was amended on August 1, 2013, to add twelve additional former Signal employees trafficked into Orange, Texas by Burnett and the others on a similar basis.

Burnett, on behalf of himself and the two other Burnett entities, returned Waivers of Service forms to the Court (ECF Nos. 11, 12, 13), establishing a response date of Burnett of August 26, 2013.  On that day Burnett filed the instant Motion under Fed. R. Civ. P. 12(b)(6) (ECF No. 32) and a separate Motion under Fed. R. Civ. P. 12(b)(2) (ECF No. 31), to which Plaintiffs are responding separately.

## II.      LEGAL ARGUMENT

**A.      Standard of Review**

Burnett recites the familiar standard from *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), with which Plaintiffs have no quarrel:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

*Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The factual allegations set out in the Complaint and RICO Fraud Chart in this case, accepted as true, go far beyond stating claims against Burnett that are plausible – they state claims against Burnett, in great detail, that are compelling.

**B.** **Plaintiffs Have Stated Their Federal Claims Against Burnett with Great Specificity.**

Burnett advances the remarkable contention that the Complaint only alleges actions by Burnett that would be consistent with any immigration lawyer honestly representing his clients – the non-immigrant workers and the U.S. employer.  That is simply not true.  The Complaint and RICO Fraud Chart allege actions by Burnett which are unethical, illegal and committed in combination with other Defendants in furtherance of a scheme which constituted violations of the Trafficking Victims Protection Reauthorization Act, RICO and various common law claims, all as set out in detail in the Complaint.

The Complaint alleges that Burnett misrepresented to these Plaintiffs that in exchange for their payment to him and other recruiters of enormous sums, they would receive U.S. green cards, entitling them to permanent residence in the U.S.  And that for additional fees, their family members could also receive green cards.  As shown above, he made these misrepresentations to specifically named Plaintiffs at specifically identified meetings at specified times.

When the program shifted from J&M and Indo-Amerisoft to Signal, Burnett again made misrepresentations to specific Plaintiffs.  He told them that they would initially receive an H-2B visa, but that this would be converted to a green card in the U.S.  (Compl. Ex. 1 ¶¶ F178, F285, F300, F318, F408.)  He knew this not to be true, and made the misrepresentations to induce additional payments by the Plaintiffs and to induce them to travel to the U.S. to become indentured labor for Signal.  (*Id.*)

Burnett misrepresented under penalty of perjury to the United States government and the states of Texas and Mississippi that Signal only needed the H-2B workers for a few months during a peak load need, when he knew that Signal had anticipated a need of two to three years for these workers.  (*Id.* ¶¶ F255, 263.)

10

Burnett misrepresented again to individual workers and groups of workers when they were in the United States on H-2B visas that green card applications were still in process. (*Id.* ¶¶ F404-F463.)  Burnett knew this to be untrue.

These are not normal activities of an honest lawyer representing both non-immigrant visa seekers and a prospective U.S. employer.  They reflect lies told by Burnett himself  to these Plaintiff workers.  He told them he was acting as their lawyer in obtaining a green card, for which service they were fraudulently induced to pay him what by their standards were huge sums.  All of this is set out in copious detail in the Complaint and in the RICO Fraud Chart. Burnett's Motion to Dismiss for lack of specificity is absolutely meritless.

**C.** **Plaintiffs' Claims Do Not Depend on Threats of Deportation Against Illegal Immigrants Equating to Involuntary Servitude.**

Burnett argues that

> [E]ach of the federal causes of action has as its linchpin the concept that threats of deportation satisfies [sic] the definition of involuntary servitude.  As a matter of law, the threat of deportation does not satisfy a determination of involuntary servitude.  *See Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527 (3rd Cir. 2012).

(Burnett Motion, p. 2.)

This argument does not provide any basis for dismissing any part of the Complaint. Although Plaintiffs do allege in a few of the hundreds of paragraphs in the Complaint and RICO Fraud Chart that they were subjected to coercive threats of deportation, those allegations are hardly the "linchpin" of any of Plaintiffs' claims.  They constitute one fact among many others that establish the fraudulent scheme and predicate acts for RICO set out in detail in the Complaint.

Plaintiffs allege that they were promised, by Burnett and others, U.S. green cards in return for their substantial payments to Burnett and others.  There should be no dispute about

this, actually, because those promises were made in writing.  In any event, at this stage, those allegations must be taken as true.  With green cards, Plaintiffs would have resident status in the U.S., without regard to whether they continued to work for Signal or for some other employer.

In fact, as the Complaint alleges, Burnett and the others knew very well that Plaintiffs would not be receiving green cards.  Coercive threats to deport Plaintiffs if they did not work as ordered, or if they complained about conditions, thus underlined the fraud perpetrated by Burnett and the others.

In addition, the *Zavala* case relied upon by Burnett involved aliens in the U.S. illegally, alleging FLSA and RICO claims against Wal-Mart, which used their cleaning services not directly but through contractors and subcontractors who hired the aliens.  In noting that "[a]bsent some special circumstances, threats of deportation are insufficient to constitute involuntary servitude," the court noted:

> Plaintiffs do not claim that they were compelled to come to work each day.  While they allege that managers often kept them beyond the end of their shift to finish their work, they do not claim that they were forced to remain once that work was finished.  The record demonstrates that Plaintiffs often switched jobs, freely moving to different employers in different cities.

*Zavala*, 691 F.3d at 541.

By contrast, these Plaintiffs were compelled to come to work every day, essentially imprisoned in a man camp surrounded by barbed wire and checked constantly by guards, present legally in the U.S. but on H-2B visas which permitted only work for Signal, living in deplorable conditions for which they were required to pay, unable to switch jobs or to move to different employers in different cities, and in enormous debt due to their extortionate payments made to Burnett and the others, so that return to India and loss of work was not a viable option.  In these special circumstances and with these other facts, threats of deportation if the workers complained

or failed to follow onerous orders could well support a finding of involuntary servitude, certainly at the pleadings stage.

Burnett's request that any part of the Complaint be dismissed on this ground should be summarily denied.[1]

## D.   The Court Should Consider the Statute of Limitations for Common Law Claims to Have Been Tolled.

Burnett states the following as if it were black letter Texas law:  "In the state of Texas, a federal class action filed in another state that is not certified will not toll the running of the statute of limitations on state based claims." (Burnett Motion, p. 6.)  But no Texas or Fifth Circuit case so holds, and the cases support tolling of the limitations periods for the common law claims in the situation presented here.

In 1974, the Supreme Court held that the filing of a class action tolls statutes of limitations during the pendency of the action, even when class certification is later denied. *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974).  The same equitable doctrine of tolling claims during the pendency of a related putative class action, known in the federal courts as *American Pipe* tolling, is well recognized in Texas.  *Ventura v. Banales*, 905 S.W.2d 423, 425 n.2 (Tex. App. – Corpus Christi 1995) (citing *American Pipe* and stating that "Texas likewise suspends the applicable statute of limitations as to all purported members of the class upon the filing of the class action"); *Bara v. Major Funding Corp. Liquidating Trust*, 876 S.W.2d 469,

---

[1] Burnett adds an argument that there was no prohibition against requiring the non-immigrant workers to pay recruitment fees, legal fees and travel costs, citing "*Valdez-Baez v. Decatur Hotels, LLC*," (the style is actually *Castellanos-Centreras v. Decatur Hotels, LLC*),  622 F.3d 393 (5th Cir. 2010).  That case is entirely inapposite.  It was a FLSA case in which the plaintiff workers sought reimbursement for these types of expenses, none of which was alleged to have been fraudulently induced.  In contrast, Plaintiffs here were induced to pay huge fees and costs based on blatantly false promises.  *Castellanos-Centreras* provides no basis for dismissal for any part of this Complaint.

471–72 (Tex. App. – Austin 1994) (applying *American Pipe* and finding that tolling was not inconsistent with the "primary purpose" of a statute of limitations, which is "to ensure that claims are asserted within a reasonable time, giving opposing party a fair opportunity to prepare a defense while evidence is still available"); *Grant v. Austin Bridge Constr. Co.*, 725 S.W.2d 366, 370 (Tex. App. – Houston [14th Dist.] 1987); *see also Beavers v. Metropolitan Life Ins. Co.*, 2007 WL 3342540, at *6 (S.D. Tex. Nov. 8, 2007) (recognizing the use of *American Pipe* tolling by Texas courts to suspend the limitations period for individual claims due to a pending class action).

This is especially true where the putative class action raising the same claims is against the same defendants, giving those same defendants notice that the very plaintiffs in the new case have those possible claims against the defendants.  *In re Norplant Contraceptive Products Liability Litig.*, 961 F. Supp. 163, 166 (E.D. Tex. 1997) (finding that the relevant question is whether the defendant had notice, and that tolling was justified because the individual claims overlapped significantly with the class claims and because the number of potential claimants was certain);[2] *Bell v. Showa Denko K.K.*, 899 S.W. 2d 749, 758 (Tex. App. – Amarillo 1995) (stating that the "basic premise" of *American Pipe* is to ensure defendants have "fair notice," and finding that the claims at issue in *Bell* were too dissimilar from the claims at issue in the related class action and that most of the defendants in *Bell* were not named as defendants in the related class action); *Grant*, 725 S.W.2d at 368 (applying *American Pipe* tolling in the context of a discernible class of plaintiffs).

The plaintiffs in the *David* case sued on behalf of a putative class of 590 individuals whose identities were well known to defendants and who included the 45 *Joseph* plaintiffs. The

---

[2] *In re Norplant* was distinguished on a different point by the Fifth Circuit in *Newby v. Enron Corp.*, 542 F.3d 462 (5th Cir. 2008), discussed below.

*David* plaintiffs asserted the same federal law claims and common law claims (fraud, negligent misrepresentation and breach of contract) as are now, after the denial of class certification in *David*, asserted by the *Joseph* plaintiffs individually.

When defendants have clear notice of the types of possible claims and the identity and number of possible claimants, that notice should be construed as "fair," and the policy of avoiding multiplication of claims strongly supports *American Pipe* tolling and the similar Texas rule. As the Fifth Circuit stated recently, the "class action mechanism would not succeed in its goal of reducing repetitious and unnecessary filings if members of a putative class were required to file individual suits to prevent their claims from expiring if certification is denied." *Hall v. Variable Annuity Life Ins. Co.*, 2013 WL 4233103, at *2 (5th Cir. Aug. 15, 2013). Where, as here, the defendants had fair notice, there is no reason that Texas courts should be expected to insist that unnamed absent class members in a putative class action pending in federal court be required pre-emptively to file the same common law claims in state court as a precaution against the risk that the class might not be certified. That would simply add unnecessarily to the burdens on the courts, often for no reason whatsoever when the class is certified. In this case, the defendants not only had notice of the claims at issue, they knew precisely the plaintiffs—including the plaintiffs in this case—who would be entitled to bring those claims if defendants succeeded in persuading the court to deny class certification, which they did.

The two cases on which Burnett relies are quite distinguishable from this case and do not preclude the application of equitable tolling to these state law claims. First, Burnett cites *Bell v. Showa Denko K.K.*, 899 S.W.2d 749 (Tex. App. – Amarillo 1995), in which the plaintiff interposed the tolling argument, to try to salvage her time-barred claims, for the first time in her motion for new trial and reconsideration filed three months after the judgment. *Id.* at 756. The

court ruled that the argument was time-barred.  *Id.* at 758.  The court went on to say that even if

the question had been preserved, it did not agree with the tolling argument, distinguishing *Grant,*

*supra* (recognizing equitable tolling where the defendant had fair notice of the earlier

claim).  *Bell*, 899 S.W.2d at 757–58.  The *Bell* court found that under *Grant,* as with the federal

rule in *American Pipe*, a statute can be tolled while class allegations are pending "provided the

defendant has notice of the type and potential number of the claims against it."  *Id.* at 758.  In the

*Bell* case, plaintiff had not been aware of the related class action before her tardy motion and

most of the defendants had not even been named in the class action, leading the court to find that

the defendants had not received fair notice of the existence of the claim, and that tolling should

not be recognized.  *Id.*  *Bell* is obviously entirely distinguishable from this case, in which these

very defendants were involved in the prior class action, were faced with the same common law

claims the absent class members now bring here, and knew that the absent class members

included the very Plaintiffs who have now sued in *Joseph* after class certification was denied.

Second, Burnett cites *Newby v. Enron Corp.*, 542 F. 3d 463 (5th Cir. 2008) for the

proposition, relying in part on *Bell*, that "the Texas courts likely will not extend *American Pipe*

tolling to this situation."  *Id.* at 472.  But, "this situation" in *Newby* was entirely different from

the present situation.  There the plaintiffs (the Fleming firm) sought to bring state court cases on

behalf of 1200 plaintiffs, asking the federal court to lift an injunction permitting it to do so.  *Id.* at

466–67.  The proposed cases appeared to be time-barred, and so futile under state law, leading

the district court to deny the request.  *Id.* at 467.  The Fleming firm argued that *American Pipe*

tolling should apply because an earlier federal securities action bringing federal law securities

claims—the *Newby* case itself as to which a class was initially certified by the district court, but

then de-certified by the Court of Appeals—should provide tolling for similar state law securities

claims in the proposed state court cases. *Id.* at 470. *Newby*'s expression of doubt that Texas courts would apply *American Pipe* tolling should be read in the context of the *Newby* case itself: a "complex federal [] class action, grounded in federal securities law and involving a not easily discernible class of plaintiffs." Opinion and Order, *Newby v. Enron Corp.*, Civil Action No. H-01-3624 (S.D. Tex. Nov. 29, 2006) (the order from which the Fleming firm appealed). There indeed would be reason to doubt that Texas courts would permit tolling in that situation, where over a thousand previously unidentified plaintiffs sought to bring state statutory claims never part of the previous putative class action.

The current situation is very different than that in *Newby*. *Newby* involved a federal class action pursuing *only* federal law claims which the Fleming firm sought to use to toll the many individual state statutory claims the Fleming firm wanted to pursue. Here, in contrast, the now decertified putative class action in *David* involved the same federal and common law claims which are now being pursued as individual claims in this federal court by Plaintiffs whom Defendants knew to be part of the putative class. The plaintiffs did not slumber on their rights, and defendants have had plenty of fair notice regarding the types of claims and number and identity of claimants.

Tolling is particularly appropriate here in light of Judge Morgan's recent (August 28, 2013) Order granting the *David* plaintiffs' motion that the relevant statutes of limitation be tolled for the putative class members in *David*. Judge Morgan's Order granted tolling with respect to several federal law claims, "as well as state law tort and contract claims." *See* Exhibit A, Order and Reasons, at 2. Burnett does not argue, nor could he, that any of Plaintiffs' claims are untimely if the statutes of limitation are considered equitably tolled by the pendency of the *David* action.

Plaintiffs' respectfully submit that this Court should find that Plaintiffs' common law claims are timely filed.

### III.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Burnett's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) be denied in its entirety.

DATED:  September 12, 2013.


**SUTHERLAND ASBILL & BRENNAN LLP**

/s/  Daniella D. Landers
Daniella D. Landers (Texas Bar No. 24026260)
1001 Fannin Street, Suite 3700
Houston, Texas  77002-6760
Telephone:  (713) 470-6100
Facsimile:   (713) 654-1301

John H. Fleming
Keith J. Barnett
Gabriel A. Mendel
Kurt Lentz
Kara D. Duffle
Teresa L. Sulmers
(admitted by *pro hac vice*)
Sutherland Asbill & Brennan LLP
999 Peachtree Street, NE, Suite 2300
Atlanta, Georgia  30309-3996
Telephone:  (404) 853-8000
Facsimile:   (404) 853-8806
***Attorneys for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 12, 2013, I electronically filed the foregoing **RESPONSE OF PLAINTIFFS TO BURNETT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)** with the Clerk of the Court using the ECF system, which sent notification of an electronic filing to all CM/ECF participants.

I further certify that on September 12, 2013 I served a true and correct copy of the foregoing document upon the below-named Defendants by depositing a copy of same in the U.S. Mail, with sufficient postage thereon to insure delivery, and properly addressed as follows:

> Global Resources, Inc.
> c/o Michael Pol
> 13 Herring Road
> Beaumont, MS 39423
>
> Mr. Billy Wilks
> 9136 Heather Lane
> Moss Point, MS 39562

I further certify that on September 12, 2013 I served a true and correct copy of the foregoing document upon the below named Defendants by forwarding a copy to them via International Mail, with sufficient postage thereon to insure delivery, and properly addressed as follows:

> Sachin Dewan
> Dewan Consultants Pvt. Ltd.
> 708, Sagar Tech Plaza
> Andhere Kurla Road
> Sakinaka Junction, Andheri (E)
> Mumbai 400 072, India

Dewan Consultants
Dewan Consultants Pvt. Ltd.
708, Sagar Tech Plaza
Andhere Kurla Road
Sakinaka Junction, Andheri (E)
Mumbai 400 072, India


*/s/ Daniella D. Landers*
Daniella D. Landers