**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| **BIJU MAKRUKKATTU JOSEPH,** *et al.* | § | |
| | § | |
| **v.** | § | **1:13-CV-324** |
| | § | |
| **SIGNAL INTERNATIONAL L.L.C.,** | § | |
| *et al.* | § | |

## MEMORANDUM AND ORDER ON SIGNAL'S MOTION TO COMPEL (DOC. NO. 127)

This case is assigned to the Honorable Ron Clark, United States District Judge, and is referred to the undersigned United States Magistrate Judge for pretrial proceedings pursuant to a referral order entered on May 22, 2013.  (Doc. No. 4.)  Pending before the undersigned is the "Signal Defendants' Motion to Compel" (Doc. No. 127) filed by Signal International, L.L.C., Signal International, Inc., Signal International Texas, G.P., and Signal International Texas, L.P. (collectively, "Signal").  This motion centers on the resolution of one issue—to what extent does the *in terrorem* effect preclude discovery into the Plaintiffs' "immigration status, immigration history, employment history, and personal information." (Doc. No. 137, p. 14.)

Signal seeks to compel production of the Plaintiffs' "drivers' licenses, visas, employment authorization documents issued by the United States, T visa applications, passports with visa stamps, documents relating to a plaintiff's involvement in or with social media, and writings relating to the plaintiff's first paycheck from a source other than Signal." (Doc. No. 127, p. 1.) Most of Signal's motion is dedicated to its need for the Plaintiffs' T visas, which is a visa available specifically to victims of human trafficking that allows those who qualify to stay in the United States for up to four years, and may even lead to permanent residence.  The Plaintiffs resist production on three grounds.  First, they claim that requiring production of documents that may reveal personal information or immigration status would "harass, embarrass, and oppress

Plaintiffs . . . and otherwise chill legitimate claims against illegal activity." (Doc. No. 137, p. 1, 4–7, 11)  This is known as the *in terrorem* effect.  Second, that there is a statutory privilege, particularly as related to the Plaintiffs' visas.  (Id. at 7–9.)  Third, in its objections to discovery propounded by the Plaintiffs, Signal claimed that anything occurring after the Plaintiffs ceased working for Signal was irrelevant.  Therefore, the Plaintiffs contend that Signal cannot not now seek to compel documents from this period.  (Id. at p. 9–10.)  In turn, the Plaintiffs request that a protective order be entered preventing discovery into "immigration status, immigration history, employment history, and personal information of Plaintiffs or their families after Plaintiffs' employment with the Signal was terminated."  (Id. at p. 14.)

After considering the parties' briefing and applicable authorities, the undersigned grants in part and denies in part Signal's motion.  Specifically, as to Signal's request for the Plaintiffs' T visas and employment authorization documents, given the nature and stage of this case, and the fact that the documents are both relevant and discoverable, the undersigned finds that Signal's need for the information outweighs any potential *in terrorem* effect.  Therefore, the undersigned grants Signal's motion as to the visas and employment authorization documents.  As for Plaintiffs' driver's licenses, passports with visa stamps, and first post-Signal paycheck, Signal failed to meet its burden of why it needs this information.  In addition, because Signal has resisted discovery of information from the period after the Plaintiffs stopped working for Signal, on the grounds that it is irrelevant, Signal cannot now claim that this information is discoverable. Accordingly, Signal's motion as it relates to these items is denied.

As to the Plaintiffs' request to enter a protective order (Doc. No. 137), the undersigned finds that the Plaintiffs have failed to show good cause why discovery on certain topics should be completely precluded.   The information that the Plaintiffs seek to protect is relevant and

discoverable. However, should Signal seek discovery that is clearly irrelevant and solely aimed at harassment, particularly extensive discovery regarding the Plaintiffs' relatives or third parties, the undersigned will at that time consider whether judicially imposed limits are necessary.

## I. Background

### 1. Factual Background

The Plaintiffs are thirty-three Indian men who allege that they are victims of human trafficking. (Doc. No. 64, pp. 2, 5–12.) The Plaintiffs assert that Signal, along with several other defendants, lured them into this country with the false promise that if they adequately performed work for Signal, that this could be a pathway to "legal and permanent work-based immigration to the United States . . . ." (Id. at 2.) Based on these allegedly false promises and misleading statements, the Plaintiffs paid significant sums of money to obtain work papers and visas to come to the United States. (Id.) Once here, the Plaintiffs claim to have found themselves in deplorable living and working conditions, as well as subject to threats of "loss of immigration status and deportation, and . . . a campaign of psychological abuse, coercion, and fraud designed to render Plaintiffs afraid, intimidated, and unable to leave Signal's employ." (Id. at p. 3.)

### 2. Procedural Background

This case has its origins in a putative class action filed in the Eastern District of Louisiana. (See Doc. No. 1, David v. Signal Int'l, L.L.C., 2:08-cv-01220 (E.D. La. March 7, 2008)). Class certification was denied, which caused the individual putative class members to file suit in the districts where their injuries allegedly occurred. (See Doc. No. 1117, David, 2:08-cv-01220 (E.D. La. Jan 4, 2012)). Cases were filed in the Eastern District of Texas, the Eastern District of Louisiana, and the Southern District of Mississippi. The Mississippi cases were consolidated and transferred to the Eastern District of Louisiana under the "first-to-file" rule.

(See Doc. No. 44, Achari v. Signal Int'l, L.L.C., No. 1:13-cv-222 (S.D. Miss. Oct. 18, 2013)).  In addition, the Equal Employment Opportunity Commission filed suit in the Southern District of Mississippi alleging multiple Title VII violations that was also transferred to the Eastern District of Louisiana.  (See Doc. No. 52, EEOC v. Signal Int'l, L.L.C., No. 1:11-cv-179 (S.D. Miss. Feb. 29, 2012)).  All of the cases in the Eastern District of Louisiana are pending in the same court.

The court in the Eastern District of Louisiana court has severely limited discovery related to immigration status.  (Doc. No. 125, p. 5.);  see also David v. Signal Int'l, L.L.C., 257 F.R.D. 114, 126 (E.D. La. 2009) ("[A]ny inquiry into plaintiffs' current immigration status, current residence and/or post-termination employment history will most assuredly strike paralyzing fear in the plaintiffs sufficient to chill any inclination they may have had to prosecute their pending claims.").  The Plaintiffs argue that "[t]o require disclosure in this case would not only conflict with other protective orders in the Related Cases, it would also allow the Signal Defendants to circumvent those orders and obtain discovery other courts have excluded." (Doc. No. 137, p. 6.) The undersigned is confident, however, that to the extent any order entered in this case conflicts with an order entered in a related case pending in the Eastern District of Louisiana, any impact can be ameliorated by proper limits on the dissemination and use of the information produced.

### III. Legal Standard

"Generally, the scope of discovery is broad and permits the discovery of 'any nonprivileged matter that is relevant to any party's claim or defense.'"  Crosby v. La. Health Serv. & Indem. Co., 647 F.3d 258, 261 (5th Cir. 2011) (quoting FED. R. CIV. P. 26(b)(1)).  "A discovery request is relevant when the request seeks admissible evidence or 'is reasonably calculated to lead to the discovery of admissible evidence.'"  Id. (quoting Wiwa v. Royal Dutch Petroleum Co., 392 F.3d 812, 820 (5th Cir. 2004)).  Moreover, "a district court has broad

4

discretion in all discovery matters, and such discretion will not be disturbed ordinarily unless there are unusual circumstances showing a clear abuse." Beattie v. Madison Cnty. Sch. Dist., 254 F.3d 595, 606 (5th Cir. 2001) (citations omitted).

"On notice to other parties and all affected persons, a party may move for an order compelling . . . discovery." FED. R. CIV. P. 37(a)(1).  "The moving party bears the burden of showing that the materials and information sought are relevant to the action or will lead to the discovery of admissible evidence." Marin v. Gilberg, Civ. A. No. V-07-62, 2009 WL 426061, at *2 (S.D. Tex. Feb. 19, 2009).  If the moving party meets its burden, "the burden then shifts to the party resisting discovery to show why the discovery is irrelevant, overly broad, or unduly burdensome or oppressive, and thus should not be permitted." Id.

In addition, "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," a party may move for a protective order under Federal Rule of Civil Procedure 26(c).  The party seeking a protective order bears the burden to show that good cause exists.  See In re Terra Int'l, Inc., 134 F.3d 302, 306 (5th Cir. 1998).  The Fifth Circuit has noted that this requires showing "'a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements.'"  Id. (quoting United States v. Garret, 571 F.2d 1323, 1326 n. 3 (5th Cir. 1978)); compare Topo v. Dhir, 210 F.R.D. 76, 77–78 (S.D.N.Y. 2002) (rejecting the idea that "protective orders must be supported by concrete factual showings" and noting that some courts only require "good cause") (citations omitted).

## IV. Analysis

Signal seeks to compel the production of the Plaintiffs' driver's licenses, visas, employment authorization documents issued by the United States government, T visa applications, passports with visa stamps, documents relating to involvement with social media,

and writings relating to their first paycheck from a source other than Signal.  (Doc. No. 127, p. 1.)  Signal does not identify which specific Requests for Production are at issue, but it appears that Requests for Production Nos. 1–8, 13, 14, and 47 call for this information.[1]  (Id., Ex.1.)  The information that Signal seeks can be grouped into two categories: documents related to the plaintiffs' immigration status (Requests Nos. 5, 6, 7, 8) and general personal information (Requests Nos. 1, 2, 3, 4, 13, 14, 47).  Each set will be addressed separately.

   a.   Documents related to the Plaintiffs' immigration status

Requests for Production Nos. 7 and 8 seek to compel production of the Plaintiffs' T visas and supporting documents, and Requests for Production Nos. 5 and 6 seek employment authorization documents.[2]  As will be discussed below, if a person qualifies for a T or U visa, they can also seek employment authorization.   Therefore, because these documents are somewhat related and both could identify the Plaintiffs' current immigration status, they will be addressed together.

   i.   *Background on T and U visas*

T and U visas were created with the passage of the Victims of Trafficking and Violence Prevention Act ("VTVPA").  See Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, §§ 107, 1513, 114 Stat. 1464, 1477–79, 1534–37.  The T visa is available to unauthorized immigrants who have been victims of human trafficking, whereas a U visa is

---

1.  Signal failed to specially identify which of its seventy-two requests for production are at issue.  The identified requests are the undersigned's best guess.  See Hart v. Nationwide Mut. Fire Ins. Co., 270 F.R.D. 166, 169 (D. Del. 2010) (denying a motion to compel and noting that because the plaintiff failed to identify which of the sixty-five requests were at issue that the plaintiffs "failed to provide the necessary specificity to allow the Court to compel Defendant to reply to any individual request").

2.  Signal's motion seeks to compel production of both T and U visas, but Signal did not specifically request the U visa in its Requests for Production.  (Doc. No. 127.)  The Plaintiffs, however, do not raise this as a reason not to produce the U visas.  Given the similarity of the T and U visas, the undersigned will consider compelling production of both.

available to victims of "qualifying criminal activity."  See 8 C.F.R. §§ 214.11 (T visa); 214.14 (U visa).  The Code of Federal Regulations contains a laundry list of "qualifying criminal activity," which includes such crimes as trafficking, involuntary servitude, and slave trade.  Id. § 214.14(a)(9).

The T and U visas share some important characteristics that are relevant to this case. First, they are available to not only the victim, but also certain family members of the victim.  Id. §§ 214.11(o) (T visa); 214.14(f) (U visa).  Second, both require cooperation with law enforcement.  To obtain a T visa, the victim must comply with any reasonable requests from a law enforcement agency for assistance in the investigation or prosecution of human trafficking. Id. § 214.11(h).  Similarly, to obtain a U visa, a victim must have been "helpful, is being helpful, or is likely to be helpful to a certifying agency in the investigation or prosecution of the qualifying criminal activity upon which his or her petition is based . . . ."  Id. § 214.14(b)(3). Third, each visa is valid for four years, and after a period of three years, the victim may seek permanent residence.  Id. §§ 245.23(a) (T visa); 241.14(g) (U visa).  Lastly, each visa authorizes the victim to lawfully obtain employment.  Id. §§ 214.11(l) (T visa); 214.14(i)(7) (U visa).

## ii.  *Signal has met its burden*

As the movant, it is Signal's burden to demonstrate that this information is discoverable. Signal argues that because there are substantial benefits derived from obtaining one of these visas, there may be an incentive for the Plaintiffs to fabricate their claims or exaggerate the extent of the harm that they suffered as a result of Signal's actions in order to acquire such a visa. Therefore, according to Signal, the visas and employment authorization documents are

discoverable because they may be probative of the Plaintiffs' motives.[3]

The information that Signal seeks falls within the broad scope of discovery.  FED. R. CIV. P. 26(b) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . ." and "relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.").[4] Information in the visas and visa applications may shed light on Signal's claim that the Plaintiffs "manufactured their allegations against Signal," or could at least lead to the discovery of admissible evidence.  (Doc. No. 122, p. 4.)  For example, in the T visa application, under penalty of perjury, a victim must check a box stating that they are a victim of severe trafficking.  The applicant is also requested to explain certain answers, such as whether they will suffer extreme hardship if removed from the United States, and whether they have reported these acts to law enforcement, as well as submit a "personal narrative statement describing the trafficking."[5]  See I-914, Application for T Nonimmigrant Status, http://www.uscis.gov/i-914.  Moreover, a law enforcement officer may also fill out a form, where they mark a box on whether the applicant has been a victim of trafficking and describing the victimization.  See I-914, Supplement B, Declaration of Law Enforcement Officer for Victim of Trafficking in Persons, http://www.uscis.gov/i-914 (noting that a person may qualify for a T visa without this form, but

---

3.  Signal devotes much of its motion to arguments related to the confrontation clause and its constitutional rights to discovery.  These arguments are misplaced.  The confrontation clause, by its terms, only applies in the criminal setting.  U.S. CONST. amend. VI ("In all *criminal prosecutions*, the accused shall enjoy the right . . . to be confronted with the witnesses against him.") (emphasis added).  In a civil case, the Federal Rules of Civil Procedure dictate Signal's rights to information.  So long as this court does not clearly abuse its discretion in applying these rules and completely deprive Signal of access to discovery (which in an extreme case may potentially be a due process violation), Signal's constitutional rights will have been protected.

4.  See also Local Civil Rule CV-26(d) (noting that information is discoverable if "it is information that is likely to have an influence on or affect the outcome of a claim or defense" or "that deserves to be considered in the preparation, evaluation or trial of a claim or defense").

5.  The Plaintiffs claim that redacted affidavits attached to their visa applications have been produced. (Doc. No. 125, p. 3 n. 1.)

"submission of the Supplement B is strongly advised").  Signal is entitled to know what boxes, if any, were checked by the Plaintiffs or law enforcement, and any proffered descriptions, which would necessarily relate to the events giving rise to this lawsuit.

In addition, Signal is likely to argue that if there is any wrongdoing, the other defendants are to blame.[6]  The information contained in the visa application, particularly information describing the instances of trafficking or other alleged crimes, may be informative as to whether the any of the Plaintiffs places blame on Signal or another codefendant.  While the undersigned is not determining at this juncture whether such evidence will be admissible at trial, it is not beyond belief that it might, at the very least, lead to the discovery of admissible evidence.  Therefore, Signal has met its burden of demonstrating this information is discoverable.

iii.   *The burden shifts to the Plaintiffs*

The Plaintiffs argue that they should not be compelled to produce immigration related documents on three grounds.  First, because Signal previously claimed that documents from the time that Plaintiffs stopped working for Signal are irrelevant, Signal cannot now claim that this information is discoverable.  Second, that these documents are privileged under 8 U.S.C. § 1367(a), and as such, Plaintiffs cannot be compelled to produce these documents.  Third, producing these documents would have an *in terrorem* effect on the Plaintiffs, as well as other victims of trafficking, and therefore, social policies trump Signal's need for the visas.

1.   The immigration documents are relevant

As to the Plaintiffs' first argument, the undersigned finds that the Plaintiffs' T and U visas cannot be classified as merely documents relating to the Plaintiffs' post-Signal activities.

---

6.  Signal has yet to file an answer in this case.  In a parallel case, however, Signal filed a cross-claim against the other defendants, alleging: "Plaintiffs' suit alleges that Signal was part of a concerted wrongdoing directed at foreign workers.  However, Signal was a victim of the cross claim defendants' actions rather than a willing participant."  (See Doc. No. 79, Samuel v. Signal Int'l, L.L.C., No. 1:13-cv-323 (E.D. Tex. April 17, 2014)).

First, it is unclear when, or even if, any of Plaintiffs sought these visas.  It is plausible that if any Plaintiffs applied for these visas, they did so while still employed at Signal.  Moreover, these documents will likely contain factual statements and assertions about the Plaintiffs' experiences related to their trafficking and their experiences while employed by Signal.  Accordingly, even if the Plaintiffs applied for these visas after they left Signal, the information contained in the applications is not simply information related to Plaintiffs' post-Signal activities.  Therefore, Plaintiffs' objection on relevancy grounds is not sufficient to deny Signal access to these documents.

### 2.   8 U.S.C. § 1367(a) is not an absolute privilege

Plaintiffs argue that the confidentiality provision of 8 U.S.C. § 1367(a) prohibits the undersigned from compelling the production of the Plaintiffs' T visa applications and related materials.  Section 1367 generally prohibits the use or dissemination of information regarding whether a person holds a T or U visa.  However, according to the plain language of the statue, it only applies to:

> the Attorney General, or any other official or employee of the Department of Justice, the Secretary of Homeland Security, the Secretary of State, or any other official or any other official or employee of the Department of Homeland Security or Department of State (including any bureau or agency or either of such departments)

8 U.S.C. § 1367(a).  Thus, the statute does not apply to the discovery obligations of private litigants.  Plaintiffs, however, argue that when read as whole, the statute confers a privilege that runs to the Plaintiffs.  Section 1376(a)(2) prohibits the above named agencies from "permit[ting] use by or disclosure to anyone . . . of any information which relates to an alien who is the beneficiary of an application . . ," and § 1376(b)(4) creates an exception, allowing certain victims to waive the restrictions on use information.  The Plaintiffs argue that because §1376(b)(4)

confers a right of waiver, that it must also create a privilege.   In other words, §1376(b)(4) evidences a victim's right not have to disclose this information, otherwise, there would be no reason for a corollary right to waive this privilege.   Therefore, according to the Plaintiffs, the undersigned cannot compel them to disclose this information against their will.

Plaintiffs misread this statute.   This section might be applicable if Signal had made a Freedom of Information Act request to one of the named agencies.   See Hawke v. United States Dep't of Homeland Sec., No. C-07-03456, 2008 WL 4460241, *5–7 (N.D. Cal. Sept. 29, 2008). Then, if the Plaintiffs had not waived the right of non-disclosure, one of those agencies would be prohibited from disclosing this information.   Here, Signal has made the request on the Plaintiffs. The undersigned does not read this statute as conferring an absolute right of privilege on the Plaintiffs in this situation.   See Demaj v. Sakaj, No. 3:09-cv-255, 2012 WL 476168, at *6 (D. Con. Feb. 14, 2012) (noting that the statutory privilege only applied to the named agencies, and that if the plaintiffs were in the possession of their immigration documents, they could be compelled to produce them).

Moreover, the undersigned does not find that requiring the Plaintiffs to disclose information related to their visas would undermine the purpose of the statue.   Had the Plaintiffs not sued Signal, their immigration status would be privileged and Signal would have no right to obtain their visas, even if criminal charges were filed against Signal.   See Hawke, 2008 WL 4460241 at *5–7.   However, once a party decides to sue and seek money damages, the calculus changes.   As discussed below, Signal has a right to defend itself, and in this case, the information contained in the visas may contain relevant information.

### 3.   The *in terrorem* effect does not outweigh Signal's need for the documents

The Plaintiffs next argue that, even if the visas are relevant, they should not be required

to produce them because if forced to do so, it would dissuade them from prosecuting this case. This is known as the *in terrorem* effect, and has been invoked to preclude or limit discovery into sensitive topics, particularly immigration status.

The *in terrorem* effect is predicated on two concepts. First, that certain remedial statutes, in order to achieve their goals, rely on enforcement by private citizens. See Rivera v. NIBCO, Inc., 364 F.3d 1057, 1065–66 (9th Cir. 2004) (discussing that "Congress intended to empower individuals to act as private attorneys general in enforcing provisions of Title VII."); Kathleen Kim, The Trafficked Worker as Private Attorney General: A Model for Enforcing the Civil Rights of Undocumented Workers, 1 U. CHI. LEGAL F. 247, 251 (2010) (noting that the VTVPA was amended in 2003 to add a private cause of action "thereby codifying a new class of private attorneys general and representing an effort to extend civil rights protections to trafficked persons."). Second, if forced to disclose their immigration status in a lawsuit, victims may be reluctant to file suit because, if it is revealed that they are not in the country legally, they may face deportation or harassment. Rivera, 364 F.3d at 1064. One court even reasoned that documented workers might be deterred from enforcing their rights for "fear that their immigration status would be changed, or that their status would reveal the immigration problems of their family or friends. . ." Id. at 1065. Thus, the *in terrorem* effect reflects a policy choice that the enforcement of certain statutes outweighs a party's need for full and unfettered discovery into matters that may be of minimal or no relevance. Rivera, 364 F.3d at 1064–66 (discussing the policy reasons behind the *in terrorem* doctrine and holding: "Given Title VII's dependence on private enforcement, we find that the national effort to eradicate discrimination in the workplace would be hampered by the discovery practices [the defendant] seeks to validate here."); Topo v. Dhir, 210 F.R.D. 76, 78 (S.D.N.Y. 2002) ("[A]llowing parties to inquire about

12

the immigration status of other parties, . . . present[s] a danger of intimidation [that] would inhibit plaintiffs in pursuing their rights.") (citation omitted).

There is no bright-line rule for when the *in terrorem* effect should limit discovery. Rather, courts balance the unique facts and posture of each case against the relevant social policies of the statutes at issue.  See, e.g., Thomas A. Doyle, "Competing Concerns in Employment Litigation: How Courts are Managing Discovery of an Employee's Immigration Status," 28 A.B.A. J. Lab. & Emp. L. 405, 406–14 (Spring 2013) (identifying eight factors courts often consider in deciding whether to allow discovery of an employee's immigration status). The two most relevant factors that courts tend to consider are: what statute the plaintiff is suing under and the procedural posture of the case.

As for the statute that a plaintiff is suing under, this informs whether immigration status is in any way relevant to the underlying case.  Where irrelevant or merely collateral to a party's claim or defense, courts often preclude immigration related discovery.  See Topo, 210 F.R.D. at 77–78.  For example, the Fifth Circuit granted a writ of mandamus and reversed a trial court's order requiring the plaintiffs to answer questions related to their immigration status, because the "protections of the Fair Labor Standards Act are applicable to citizens and aliens alike and whether the alien is documented or undocumented is irrelevant."  In re Reyes, 814 F.2d 168, 170–71 (5th Cir. 1987); see also EEOC v. Evans Fruit Co., Inc., CV-10-3033-LRS, 2012 WL 442025 (E.D. Wash. Feb. 10, 2012) (noting that immigration status has no bearing on determining liability under Title VII).  Conversely, when immigration status is arguably relevant, courts have allowed for discovery.  See Cazorla v. Koch Foods of Miss., L.L.C., No. 3:10-cv-135, 2014 WL 281979, at *2 (S.D. Miss. Jan. 24, 2014).

The heart of the issue in this case is human trafficking.  One could argue that, like claims

under Title VII or the FLSA, immigration status is irrelevant to claim for trafficking.  See In re Reyes, 814 F.2d at 170–71.  A person can bring a trafficking claim regardless of whether they are a citizen, legal immigrant, or undocumented worker.  See, e.g., 18 U.S.C. § 1590.  However, something sets a trafficking claim apart from one brought pursuant to Title VII or the FLSA— the T and U visa.  These visas create a safe harbor, allowing victims of trafficking and certain other crimes to stay in the United States legally while prosecuting their case.  No such equivalent visa, amnesty, or safe harbor exists for a plaintiff bringing an FLSA or Title VII claim.

The availability of these visas impact the *in terrorem* analysis in two important respects. First, they create an incentive for an undocumented worker to fabricate or exaggerate a claim of human trafficking.  See Cazorla, 2014 WL 281979, at *1 (noting that certain immigration benefits were available to plaintiffs due to their allegations).  The undersigned is not insinuating that this is the case here.  However, it appears that this is at least conceivable, and Signal should have the opportunity to explore this possibility.  Second, they create a safe harbor for illegal immigrants who were victims of trafficking.  One of the underpinnings of the *in terrorem* effect is that undocumented workers will be less likely to seek redress for fear that their immigration status will be revealed and they will then face deportation.  Because an undocumented worker who was the victim of severe trafficking can receive a T or U visa, any chilling effect is greatly minimized.  In fact, it is difficult to imagine an undocumented worker who would bring a civil suit alleging to be a victim of trafficking, but fail to seek such a visa.  Or, stated another way, it is difficult to comprehend an instance in which a person would not report that they were a victim of human trafficking for fear their T visa would be potentially discoverable in a lawsuit years later—a lawsuit they themselves initiated.  The only workers whose rights might be chilled would be those who were trafficked but failed to qualify for either visa.  Empirical evidence,

however, suggests that this is a relatively small group, and the Plaintiffs have not suggested that could be the case here.[7]

The procedural posture of a case also impacts the *in terrorem* analysis.  For example, in Rivera, the Ninth Circuit affirmed the trial court's issuance of a protective order precluding discovery related to immigration status, because such discovery was irrelevant at that time to the issue before the court, which was liability (as opposed to damages) under Title VII.  Rivera, 364 F.3d at 1074–75.  The trial court, however, had yet to decide whether the proceedings were going to be bifurcated, leaving the door open to the possibility that the analysis may change in the future.  See Rivera, 364 F.3d at 1062, 1070.  As one court subsequently noted, "Rivera did not foreclose the possibility that immigration status, although clearly irrelevant to the Title VII liability determination, might not become relevant later in the remedies portion of the litigation." Rodriguez v. ACL Farms, Inc., No. cv-10-3010, 2010 WL 4683743, *4 (E.D. Wash. Nov. 12, 2010).  Likewise, in David, one of the parallel cases pending in the Eastern District of Louisiana, when the court first entered the protective order (that the Plaintiffs argue the undersigned should adopt), the issue being resolved was class certification.  David, 257 F.R.D. at 125.  Immigration status of the plaintiffs had no bearing on the issues of numerosity, commonality, typicality, and adequacy of representation.  Id.

Courts, however, have recognized that as a case progresses and moves towards trial, the pendulum begins to swing in favor of allowing discovery, and depending on the facts of the case,

---

7.  From 2002 through 2012, 5,820 T-1 visa applications, which are visas issued directly to the victim, were filed.  See U.S. Citizenship and Immigration Services Form I-914 – Application for T Nonimmigrant Status, Form I-918 – Petition for Nonimmigrant Status Receipts, Approvals, and Denials, Fiscal Year 2013, Through Third Quarter, http://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-914-application-t-nonimmigrant-status (last visited October 2, 2014).  Of those applied for, 1,671 were denied, equating to 29%.  As for T-2,3,4 or 5 visas, which are available to family members of a victim, 606 applications, or 20%, were denied.  From 2009 through 2012, 18% of U-1 visa (victim visas) were denied, and 16% of U-2,3,4,5 (family member visas) were denied.

a defendant's need may outweigh any social policies that would otherwise prevent disclosure. See Cazorla, 2014 WL 281979 at *1. For example, in Cazorla, Koch Foods of Mississippi was accused of committing atrocities against Hispanic workers. Id. The court, early in the case, entered a protective order prohibiting discovery of immigration related documents. Id. Koch Foods later sought reconsideration of the protective order and specifically to compel the production of the plaintiffs' U visas. Id. The court granted Koch's motion as to the visas, noting that they were relevant because "immigration benefits may be made available to [the plaintiffs] because of the allegations they have made." Id. The court held:

> The issue is the relevance of the information sought by Koch Foods to the claims and defenses in this action. Koch Foods has raised a legitimate defense regarding U visas, T visas, or other immigration benefits, and it is entitled to pursue discovery, including visa applications, that supports the defense. The relevance of this information clearly outweighs its *in terrorem* effect, as any individuals who have applied for immigration benefits have, necessarily, already disclosed their immigration status to federal authorities.

Id. at *2. Likewise, other courts, after balancing all the factors, have found that a defendant's need for information outweighed any potential *in terrorem* effect. See Camayo v. John Peroulis & Sons Sheep, Inc., Nos. 10-cv-772, 11-cv-1132, 2012 WL 5931716, at *1–2 (D. Colo. Nov. 27, 2012) (granting a motion to compel production of the plaintiffs' T or U visas in a human trafficking case); EEOC v. Global Horizons, Inc., No. cv-11-3045, 2013 WL 3940674, at *4–7 (E.D. Wash July 31, 2013) (lifting the prohibition on discovery related to the plaintiffs' immigration status because the information was relevant, and the plaintiffs failed to show good cause warranting a continued limitation).

After weighing all the relevant factors and policies, the undersigned finds that the Plaintiffs have failed to meet their burden of showing that "good cause" exists to enter a protective order precluding production of the Plaintiffs' visa related documents. The Plaintiffs

have not demonstrated that there would in fact be a chilling effect if, at this stage, they were required to disclose their visas.  See In re Terra Int'l, Inc., 134 F.3d 302, 306 (5th Cir. 1998) (noting that a party must make "a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements").  What the undersigned finds most compelling is that, in this context, any chilling effect is largely offset by the availability of the T or U visa.  A victim of trafficking does not need to choose between risking deportation by filing suit to rectify a wrong, or allowing atrocities to go unpunished in order to avoid bringing attention to their immigration status.  Instead, purported victims of human trafficking are allowed to blow the whistle on their employers while at the same time being protected from deportation by obtaining a T visa.  While there may be a small subset of people who are legitimate victims of trafficking but denied a T visa, when balanced against the relevancy of this information and Signal's need for it, the undersigned finds protecting this small and undefined class is an insufficient reason to deny Signal the information it seeks.

Accordingly, the undersigned grants Signals' motion as to the Plaintiffs' T and U visas and any employment authorization documents issued in conjunction with these visas.

> iv. *Limits on further discovery and on the use and dissemination of the Plaintiffs' documents*

The Plaintiffs seek to block Signal from obtaining personal information about them, as well as their relatives.  (Doc. No. 137, p. 14.)  As discussed above, some discovery into the Plaintiffs' immigration status is permissible.  Nevertheless, discovery aimed at sensitive information of people who are not parties to this case may very well have an *in terrorem* effect on the Plaintiffs and deter them from prosecuting this suit.  Signal, however, has not made such a request, as no Request for Production is aimed at documents related to any third parties.  Therefore, at this time, there is no need to enter a broad protective order.  Should Signal seek

such discovery, the undersigned will at that time weigh the potential *in terrorem* effect against Signal's need for the information, which may alter the balance of the various factors.

In addition, it is worth noting that discovery related to the immigration status of friends and relatives would appear to be irrelevant. For example, a condition precedent of a family member receiving a visa is that the victim be awarded a visa. 8 C.F.R. § 214.11(o) ("an alien who has applied for and been granted T-1 nonimmigrant status may apply for admission of an immediate family member . . . ."). Therefore, production of the named Plaintiffs' visa information should be sufficient for Signal to test its theories regarding the Plaintiffs' motives. Should Signal seek discovery related to the Plaintiffs' family members, it will need to demonstrate a particular need. However, because it is theoretically possible that such a need may exist, the undersigned will address that issue if and when it presents itself.

The Plaintiffs shall designate any documents produced pursuant to this order as "Confidential" and those documents are to be treated as "Protected Documents," as defined in the protective order governing this case. (Doc. Nos. 55 and 94.) Moreover, the undersigned is mindful that to some extent this order conflicts with ones that have been entered in the cases pending in the Eastern District of Louisiana. Therefore, to prevent Signal from circumventing the protective orders in other cases, Signal may *only* use information regarding the Plaintiffs visas and immigration status produced pursuant to this order in *this case*; use outside this case, in any manner, including depositions, motions, etc., particularly in the EEOC case, which shares common plaintiffs, would be a violation of this order and would subject the violating party to sanctions.[8]

_____

[8] This does not impact the "Consent Order Regarding Use of Discovery from Related Cases." (Doc. No. 96.) Rather, this order only applies to sensitive information, particularly information about the Plaintiffs' immigration status. While this standard may appear vague, the undersigned is confident that if the parties take a common sense approach, there should be no issues.

b.  Requests for production seeking general personal information

In addition to the immigration materials discussed above, Signal also seeks to compel production of the Plaintiffs' "driver's licenses, passports with visa stamps, documents relating to a plaintiffs' involvement in or with social media, and writings relating to the plaintiffs' first paycheck from a source other than Signal."  (Doc. No. 127, p. 1.)

At the outset, Signal has objected to several requests for production propounded by the Plaintiffs on the grounds that:

> documents requested for the time frame January 1, 2004 through July 31, 2005 and February 1, 2009 through December 31, 2009 are not relevant or likely to lead to the discovery of relevant information.  Signal objects to the date range in this request because only events during the recruitment of the H2B workers and their time of employment at Signal.  Only that portion of the requested date is probative of the claims in this case.

(Doc. No. 137, Ex. 1, pp. 2, 4, 12) (emphasis added).  Signal cannot refuse to produce documents on grounds that any documents from outside a certain period are irrelevant to the dispute, and then seek to compel production of documents from this same timeframe.  As the Plaintiffs correctly note, "the Signal Defendants cannot have it both ways."  (Id. at p. 10.)  Because Signal has objected to any discovery after the Plaintiffs left Signal, and from the information before the court there is no indication that Signal withdrew these objections or that the parties have subsequently agreed to expand the relevant period for discovery, the undersigned denies Signal's motion as to any of these documents that were created after the Plaintiffs left Signal.

Considering this limitation as to the relevant period, the undersigned will examine whether Signal has carried its burden, and in turn, whether the Plaintiffs have carried their burden for showing why these documents should not be produced.  As for Plaintiffs' drivers licenses, passports, and first post-Signal paycheck, Signal's motion makes no mention of why these documents are relevant to this dispute.  Signal's motion is primarily focused on the

immigration related documents discussed above, and the main premise of its motion is that it needs documents that may evidence motive.  These documents are not relevant to motive, in any way probative of motive, nor are they likely to lead to the discovery of admissible evidence.  Therefore, Signal has failed to carry its burden, and its motion as to these requests is denied.  Moreover, "writings relating to the plaintiffs' first paycheck from a source other than Signal" are by definition documents that were generated *after* the Plaintiffs left Signal.  As discussed above, Signal has declared any documents from this time irrelevant.  Therefore, Signal cannot now seek to compel these documents.

As for Signal's request for documents relating to a plaintiffs' "involvement in or with social media," these documents could conceivably contain information related to the issues in this case.  For example, it is possible that the Plaintiffs' social media pages contain information probative of the Plaintiffs' living and working conditions while employed by Signal, their experiences of being trafficked, or even discussions about suing Signal.  Therefore, Signal has met its minimal burden of showing that this information is discoverable.  The Plaintiffs' primary reason for resisting production of these documents is the potential *in terrorem* effect it would have.  For reasons discussed above, the undersigned does not find that the *in terrorem* effect is a sufficient reason to deny Signal access to these documents, therefore, the Plaintiffs fail to meet their burden of showing why they should not be compelled to produce these documents.

Accordingly, Signal's motion is granted in part and denied in part as to the Plaintiffs' Facebook pages.  The Plaintiffs shall produce documents responsive to this Request.  However, the Plaintiffs are only required to produce documents dating from the time they were being recruited, and the time that they were employed by Signal.  Because Signal, in its own responses to discovery, has limited the relevant period for discovery, the Plaintiffs' *current* Facebook

20

profiles are irrelevant.  Moreover, to the extent that the Plaintiffs communicated with their lawyers via Facebook, or its messenger program, while employed by Signal, these are privileged. Plaintiffs shall indicate whether such communications exist, and if they do and the Plaintiffs withhold them, the Plaintiffs shall produce a privilege log.

## V. Conclusion

It is therefore ORDERED that Signal's "Motion to Compel" (Doc. No. 127) is **GRANTED IN PART AND DENIED IN PART**.  Within seven (7) days, the Plaintiffs shall produce documents responsive to Signal's Requests for Production Nos. 5, 6, 7, and 8, including information related to U visas.  Signal shall also produce documents responsive the Requests for Production Nos. 12 and 13, but must only produce documents created during the recruitment process or while the Plaintiffs were employed by Signal.  Should any of the documents be withheld as attorney-client communications, the Plaintiffs shall produce a privilege log sufficiently detailed so Signal may assess whether the communication is truly privileged. Signal's motion as to Requests for Production Nos. 1, 2, 3, 4, and 47 is denied.  Furthermore, the Plaintiffs' request for the entry of a protective order (Doc. No. 137) is **DENIED**.

Lastly, Signal is precluded from using information produced pursuant to this order in any other matter pending in either the Eastern District of Texas or Eastern District of Louisiana.

SIGNED this 15th day of October, 2014.

_____
Zack Hawthorn
United States Magistrate Judge