# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| BIJU MUKRUKKATTU JOSEPH, et al., | * | CIVIL ACTION NO: |
| Plaintiffs, | * | 1:13-cv-00324-MAC-ZJH |
| | * | |
| v. | * | DISTRICT JUDGE |
| | * | MARCIA A. CRONE |
| SIGNAL INTERNATIONAL, LLC, et al., | * | |
| | * | MAGISTRATE JUDGE |
| Defendants. | * | ZACK HAWTHORN |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' "MOTION TO EXCLUDE DR. LOUISE SHELLEY AS EXPERT" AND IN OPPOSITION TO DEWAN DEFENDANTS' "MOTION AND INCORPORATED MEMORANDUM TO EXCLUDE EXPERT WITNESS TESTIMONY"

Erin Casey Hangartner, La. Bar No. 24768
Alan Dean Weinberger, La. Bar No. 13331
Hal D. Ungar, La. Bar No. 31344
Elham R. Rabbani, La. Bar No. 33322
Brian C. Roux, La. Bar No. 35298
Lance R. Rydberg, La. Bar No. 02089
Mitchell P. Hasenkampf, La. Bar No. 32870
Robert L. Keller III, La. Bar No. 35188
Kevin P. Maney, La. Bar No. 33956
Lauren Masur Davis, La. Bar No. 34669
HANGARTNER RYDBERG & TERRELL, LLC
701 Poydras Street, Suite 310
New Orleans, LA 70139
Telephone: (504) 522-5690
Facsimile:  (504) 522-5689
ehangartner@hanrylaw.com
aweinberger@hanrylaw.com
hungar@hanrylaw.com
erabbani@hanrylaw.com
broux@hanrylaw.com
lrydberg@hanrylaw.com

1

mhasenkampf@hanrylaw.com
rkeller@hanrylaw.com
kmaney@hanrylaw.com
lmasur@hanrylaw.com

And

Patricia A. Bollman, La. Bar 17563
James L. Cornblatt, (Pro Hac Vice)
Patricia A. Bollman,
A Professional Law Corporation
Post Office Box 13707
New Orleans, LA 70185
Telephone: (504) 218-5887
Facsimile: (504) 304-0890
patricia@bollmanfirm.com
cornblatt25@gmail.com

***Counsel for Signal International, L.L.C.***
***Signal International, Inc.,***
***Signal International Texas, G.P., and***
***Signal International Texas, L.P.***

# TABLE OF CONTENTS

**Page**

BACKGROUND……………………………………………………………………… 1

LEGAL STANDARD…………………………………………………………………… 1

ARGUMENT…………………………………………………………………………..4

    I.     DR. LOUISE SHELLEY IS INDISPUTIBLY QUALIFIED AS AN
EXPERT WITNESS IN THE AREAS OF HUMAN TRAFFICKING
AND ORGANIZED CRIME, AND HER TESTIMONY WILL ASSIST
THE TRIER OF FACT TO UNDERSTAND THE EVIDENCE AND
DETERMINE FACTS IN ISSUE IN THIS LITIGATION…………………….. 4

    II.    DR. SHELLEY'S EXPERT REPORT AND TESTIMONY ARE
BASED ON SUFFICIENT FACTS OR DATA……………………………... 5

    III.    DR. SHELEY'S EXPERT REPORT AND TESTIMONY ARE THE
PRODUCT OF RELIABLE PRINCIPLES AND METHOD…………………...8

    IV.    DR. SHELLEY HAS RELIABLY APPLIED THE PRINCIPLES AND
METHODS TO THE FACTS OF THE CASE IN AUTHORING HER
EXPERT REPORT AND TESTIMONY……………………………………... 10

    V.    PLAINTIFFS ARGUMENTS………………………………………………… 11

        1.  PLAINTIFFS CONTEND DR. SHELLEY'S METHODOLOGY IS NOT
SCIENTIFICALLY VALID; THEY ARE IN ERROR…………………… 12

        2.  PLAINTIFFS ERRONEOUSLY ACCUSE DR. SHELLEY OF
REGURGITATING SIGNAL'S POSITION……………………………… 13

        3.  PLAINTIFFS AVER PORTIONS OF DR. SHELLEY'S TESTIMONY
WOULD BE IRRELEVANT TO THE HUMAN TRAFFICING CLAIMS;
IN FACT, THOSE OPINIONS GO TO THE HEART OF THE
MANUFACTURED NATURE OF THE HUMAN TRAFFICKING
CLAIMS IN THIS LITIGATION………………………………………..14

      a.   The Thirteenth Amendment strategy…………………………………...15

      b.   The Pickle Pattern Provides a Template for Manufacturing Human Trafficking……………………………………………………………17

VI.    DR. SHELLEY'S TESTIMONY AND EXPERT REPORT DO NOT CONSTITUTE LEGAL CONCLUSIONS...……………………………………20

    4.   DR. SHELLEY DOES NOT TESTIFY REGARDING HER ASSESSMENT OF CREDIBILITY EITHER OF PLAINTIFFS OR WITNESSES……………………………………………………………..22

VII.   DEWAN DEFENDANT'S ARGUMENTS…………………………………23

CONCLUSION……………………………………………………………………23

**<u>EXHIBITS</u>**:

A.  Dr. Shelley's CV

B.  David Report

C.  Working Beyond Unions transcript

D.  Nayapulli Check

E.  Freedom from Fear Transcript

F.   Shelley Dep. 29, 53, 107, 163, 167-8, 175-182,

G.  Burke Dep. 29, 118-119,

H.  Jayachandran Dep. 248-251,

I.   Iju James Dep. 272-273, 278-280

J.   Mowl Dep. 133-134

K.  Samuel Report

L.  Joseph Report

<u>**TABLE OF AUTHORIES**</u>

Page

**Cases**

<u>Abraham v. Singh</u>,
2005 U.S. Dist. LEXIS 17800, 2005 WL 2036887 (E.D. La. July 26, 2005) ...................... 18, 19

<u>Archer Daniels Midland Co. v. Aon Risk Servs.</u>,
    356 F.3d 850 (8th Cir. 2004) ................................................................................. 3, 13, 14, 23

<u>Bonner v. ISP Techs., Inc.</u>,
    259 F.3d 924 (8th Cir. 2001) ...................................................................................... 3, 13, 14

<u>Chellen v. John Pickle Co.</u>,
    446 F. Supp. 2d 1247  (N.D. Okla. 2006)............................................................. 3, 14, 17, 18

<u>Curtis v. M&S Petroleum, Inc</u>.
    174 F.3d 661 (5th Cir. 1999) ................................................................................................ 2,3

<u>Daubert v. Merrell Dow Pharms.</u>,
    43 F.3d 1311 (9th Cir. 1995) .............................................................................................. 2, 12

<u>Daubert v. Merrell Down Pharm., Inc.</u>,
    509 U.S. 579  (1993)............................................................................................................. 2, 9

<u>First United Fin. Corp. v. U.S. Fid. & Guar. Co.</u>,
    96 F.3d 135 (5th Cir. 1996)...................................................................................................... 3

<u>Goodman v. Harris Cnty.</u>,
    571 F.3d 388 (5th Cir. 2009) ................................................................................................... 3

<u>Johnson v. Arkema, Inc.</u>,
    685 F.3d 452 (5th Cir. 2012) ........................................................................................... 2,  8, 9

<u>Mathis v. Exxon Corp.</u>, 302 F.3d 448 (5th Cir. 2002)........................................................... passim

<u>Moore v. Ashland Chem.,Inc.</u>,
    151 F.3d 269 (5th Cir. 1998) ................................................................................................... 2

<u>Owen v. Kerr-McGee Corp.</u>, 698 F.2d 236, 240 (5th Cir. 1983) ................................................... 3

<u>Pipitone v. Biomatrix, Inc.</u>,
    288 F.3d 239 ............................................................................................................................ 2

Schmidt v. MTD Prods.,
    2006 U.S. Dist. LEXIS 45275, 2006 WL 5127539 (E.D. La. July 5, 2006) ........................... 22

United States v. 14.38 Acres of Land,
    80 F.3d 1074  (5th Cir. 1996) ............................................................................. 3, 12, 14, 23

United States v. Fogg,
    652 F.2d 551 (5th Cir.1981) ......................................................................................... 3

Viterbo v. Dow Chemical Co.,
    826 F.2d 420 (5th Cir.1987) ...................................................................................... 3, 12, 14

**Other Authorities**

Anthony DeStefano, *The War on Human Trafficking: U.S. Policy Assessed*
    (Rutgers University Press, 2007) ....................................................................................... 9

Article: A Strategic Plan For Using The Thirteenth Amendment To Protect Immigrant
    Workers,*27 Wis. J.L. Gender & Soc'y 133 (2012)*.................................................... 16

Article: Labor's Constitution of Freedom,*106 Yale L.J. 941 (1997)*........................................... 16

Comment: Process Theory and Emerging Thirteenth Amendment Jurisprudence: The Case of
    Agricultural Guestworkers,*41 U.S.F. L. Rev. 233 (2006)*...................................................... 16

George Mason University, Faculty Handbook (Oct. 22, 2014),
    http://www.gmu.edu/resources/facstaff/handbook/GMU_FACULTY_HANDBOOK-
    2014_Final.pdf ........................................................................................................ 4

Louise Shelley, *Human Trafficking: A Global Perspective*
(Cambridge University Press, 2010 ………………………………………………………... 5, 8, 9

Eva Steiner, *French Law: A Comparative Approach* (Oxford University Press, April 30, 2010)..8

TraCCC, *Welcome to TraCCC* (Oct. 22, 2014), http://traccc.gmu.edu/. ....................................... 4

**Rules**

Fed R. Evid. 403 ........................................................................................................... 3

Fed. R. Civ.P. 26(a)(2)(B) ............................................................................................... 22

Fed. R. Evid. 702 ....................................................................................................... 2, 5

Fed. R. Evid. 703 ......................................................................................................... 23

Fed. R. Evid. 704 ........................................................................................................... 3

Defendants Signal International, LLC ("LLC"), Signal International, Inc.  ("Inc."), Signal International Texas, G.P. ("GP"), and Signal International Texas, L.P. ("LP") (hereinafter collectively "Signal") hereby present this Memorandum of Law in Opposition to Plaintiffs' "Motion to Exclude Dr. Louise Shelley as Expert" and the Dewan Defendants' "Motion and Incorporated Memorandum to Exclude Expert Witness Testimony". R. Doc. 156; R. Doc. 159. For the reasons, *infra*, Plaintiffs' motion should be denied. For the same reasons, *infra*, the Dewan Defendants' motion should likewise be denied.

## BACKGROUND

Signal designated Dr. Louise Shelley in *David, Samuel*, and *Joseph* as an expert witness to testify regarding human trafficking and related organized crime. *David* R. Doc. 1619. She submitted expert reports in all three cases, and was deposed in all cases. Plaintiffs' Counsel in *David, Joseph,* and *Samuel* questioned Dr. Shelley about her expert reports, but only introduced the *David* report. Shelley Dep. Exhibit 1. Dr. Shelley testified that her reports in *Samuel* and *Joseph* were identical, and that the later submitted *David* report was a revision that contained additional information beyond that specific to the *David* plaintiffs. This memorandum will refer to the paragraph numbers in the *David* report on which she was deposed by Plaintiffs, but attaches the *Samuel* and *Joseph* reports as additional exhibits. Exhibit K Report of Dr. Shelley in *Samuel*; Exhibit L Report of Dr. Shelley in *Joseph*.

## LEGAL STANDARD

The admission of expert testimony is governed by the Federal Rules of Evidence which provide that opinion testimony may be given by, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education" provided "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine

a fact in issue", "the testimony is based on sufficient facts or data", "the testimony is the product of reliable principles and methods", and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "The party offering the expert must prove by a preponderance of the evidence that the proffered testimony satisfies the rule 702 test." Mathis v. Exxon Corp., 302 F.3d 448, 459-60 (5th Cir. 2002) (citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)).

Nonetheless, the trial courts act as "gatekeepers" who must make a preliminary assessment of whether a purported expert's testimony is reliable and relevant. *See* Pipitone v. Biomatrix, Inc., 288 F.3d 239, 243-44 (citing Daubert v. Merrell Down Pharm., Inc., 509 U.S. 579, 592-93 (1993)); *See also* Johnson v. Arkema, Inc., 685 F.3d 452, 459 (5th Cir. 2012).  Reliability requires the expert opinion be grounded in scientific methods and procedures and be more than unsupported speculation or subjective belief. *See* Johnson, 685 F.3d 452, 459 (citing Curtis v. M&S Petroleum, Inc. 174 F.3d 661, 668 (5th Cir. 1999)). "This requires some objective, independent validation of the expert's methodology." Moore v. Ashland Chem.,Inc., 151 F.3d 269, 276 (5th Cir. 1998) (en banc). "Furthermore, courts consider the following non-exclusive list of factors when conducting the reliability inquiry: (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community." Johnson, 685 F.3d 452, 459. "That the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were 'derived by the scientific method.'" Daubert v. Merrell Dow Pharms., 43 F.3d 1311, 1317 (9th Cir. 1995).

Opinions which embrace an ultimate issue are not *per se* objectionable under Rule 704, but a witness is not permitted to tell the jury what result to reach or to give legal conclusions. Fed. R. Evid. 704; *See* Owen v. Kerr-McGee Corp., 698 F.2d 236, 240 (5th Cir. 1983) (citing  United States v. Fogg, 652 F.2d 551, 557 (5th Cir.1981), cert. denied). "Nor, may an expert go beyond the scope of his expertise in giving his opinion." Goodman v. Harris Cnty., 571 F.3d 388, 399 (5th Cir. 2009) (citing First United Fin. Corp. v. U.S. Fid. & Guar. Co., 96 F.3d 135, 136 (5th Cir. 1996)). Likewise, testimony that is otherwise relevant may still be excluded if its probative value is outweighed by the danger of it posing an, "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed R. Evid. 403.

 "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." United States v. 14.38 Acres of Land, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting Viterbo v. Dow Chemical Co., 826 F.2d 420, 422 (5th Cir.1987)). "Generally, the factual basis of an expert's opinion goes to credibility of the testimony, not admissibility." Archer Daniels Midland Co. v. Aon Risk Servs., 356 F.3d 850, 858 (8th Cir. 2004) (citing Bonner v. ISP Techs., Inc., 259 F.3d 924, 929 (8th Cir. 2001)). "An expert's opinion must be excluded only if it 'is so fundamentally unsupported that it can offer no assistance to the jury.'" Id. at 858 (internal citation omitted).

**ARGUMENT**

I.   **DR. LOUISE SHELLEY IS INDISPUTIBLY QUALIFIED AS AN EXPERT WITNESS IN THE AREAS OF HUMAN TRAFFICKING AND ORGANIZED CRIME, AND HER TESTIMONY WILL ASSIST THE TRIER OF FACT TO UNDERSTAND THE EVIDENCE AND DETERMINE FACTS IN ISSUE IN THIS LITIGATION.**

Dr. Louise Shelley is a University Professor[1] at George Mason University in the School of Public Policy, Government and International Affairs. *See* Exhibit A, *Curriculum Vitae* of Dr. Louise Shelley at 1. Dr. Shelley is also the director of the Terrorism, Transnational Crime and Corruption Center (TraCCC)[2] housed at George Mason University. Id. at 1. Dr. Shelley has nearly 40 years of experience teaching at the university level and conducting research regarding topics pertinent to the expert testimony she will offer here. Id. at 1-2. She is the recipient of over 30 honors and awards both within her university and from outside organizations. Id. at 2-3. Her work and research have generated over 11.3 million dollars in contracts and grant funding to date. Id. at 4-6. She has served on 13 editorial, scientific, and advisory boards for peer reviewed publications. Id. at 6-7. Dr. Shelley has been a member or chair involved in 30 professional, academic, and policy organizations. Id. at 7-8. She has testified before congress 6 times regarding human trafficking and transnational crime. Id. at 9. She has testified 5 times before the Commission on

---

[1] "2.2.5 University Professor

From time to time the University will encounter opportunities to recognize current members of the faculty or appoint to its faculty women and men of great national or international reputation. The rank of University Professor is reserved for such eminent individuals. University Professors are appointed by the President and the Board of Visitors with the advice and consent of a standing committee appointed by the Provost.

University Professor appointments are normally reserved for full professors. The criteria for such appointments include substantial research or scholarship or arts credentials, as appropriate to the discipline." George Mason University, Faculty Handbook (Oct. 22, 2014), http://www.gmu.edu/resources/facstaff/handbook/GMU_FACULTY_HANDBOOK-2014_Final.pdf.

[2] "The Terrorism, Transnational Crime and Corruption Center (TraCCC) is the first center in the United States devoted to understanding the links among terrorism, transnational crime and corruption, and to teach, research, train and help formulate policy on these critical issues. TraCCC is a research center within the School of Policy, Government, and International Affairs at George Mason University." TraCCC, *Welcome to TraCCC* (Oct. 22, 2014), http://traccc.gmu.edu/.

Security and Cooperation in Europe, and once before the Mexico City Legislature on similar topics. Id. at 9.

Dr. Shelley is a prolific author of peer-reviewed material. She authored or edited 15 books and monographs. Id. at 10. She published 90 peer reviewed articles. Id. at 11-16. She further authored 103 book chapters. Id. at 16-23. She wrote over 29 published reviews. Id. 24-25. She also contributed 31 other writings to newspapers, magazines, and other such publications. *In toto*, Dr. Shelley has contributed 268 significant pieces of academic work and research to her field. Id. at 10-25. She has lectured at numerous universities, schools, institutes, and research centers across the world. Id. at 28-29. Dr. Shelley's book, Human Trafficking: A Global Perspective, is used as a standard textbook in human trafficking courses at numerous universities.[3] It is unavoidable to use the cliché, because she has literally written the book on human trafficking.

Dr. Shelley's impressive credentials, arsenal of peer-reviewed publications, and extensive experience in the areas of human trafficking and organized crime research more than satisfies Rule 702's requirement that her, "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue" and easily meets the mere preponderance required. Fed. R. Evid. 702; *See* Mathis, 302 F.3d 448, 459-60.

## II.   DR. SHELLEY'S EXPERT REPORT AND TESTIMONY ARE BASED ON SUFFICIENT FACTS OR DATA.

Dr. Shelley's expert report lists numerous sources of facts and data she examined in forming her opinions. *See* Exhibit B, Expert Report of Dr. Louise Shelley at ¶ 6; *See also* Id. at Appendix I; *See also* Id. at N.1-62. She reviewed legal filings from both Plaintiffs and Signal including the First, Third, and Fifth Amended Complaints; the RICO fraud chart attached to the

---

[3] *See generally*, http://google.com, using search terms: "human trafficking a global perspective" syllabus

Third and Fifth Amended Complaints; Signal's answer, affirmative defenses, and cross claims; Signal's memo in opposition to class certification; and Judge Zainey's order and reasons denying class certification. Id. at Appendix I. She also reviewed thousands of pages of relevant documents produced during discovery. Id. at Appendix I. She reviewed financial information from Signal including payroll records for workers whose pay was reduced. Id. at ¶ 6; Id. at Appendix I. She reviewed Safety information regarding Signal including awards, safety policies, and injury reports. Id. at ¶ 6; Id. at Appendix I. She watched video walkthroughs taken of the man camps. Id. at Appendix I.  Dr. Shelley did not limit herself to Signal's documents, but examined Plaintiffs' statements, available T/U visa information, and testimony as well as the testimony of other defendants. Id. at ¶ 6.

Dr. Shelley did not simply receive documents, she also conducted field work to gather first hand observations to inform her opinions. She visited and ate at the New Orleans restaurant owned and operated by the caterer who provided food services at Signal's Pascagoula, MS and Orange, TX housing facilities; in so doing, she sampled common items that were served to the Indian H-2B workers, and discussed details about the catering (including menus, varieties, and food storage and preparation). Id. at ¶ 6. She visited the Signal Pascagoula, MS yard, administrative offices, and housing facility. Id. at ¶ 6. In the housing facility she observed the different housing modules (both the original GE modules and subsequent Ameritech modules), modules that were brought to Pascagoula from the Texas facility, the common areas, entertainment lounges, mess hall/kitchen facilities, surrounding fences, and the security station. Id. at ¶ 6. She conducted interviews of numerous Signal employees including former H-2B visa workers who still work at Signal; high level management including CEO Richard Marler, CFO Chris Cunningham, VP Ron Schnoor, VP Bill Bingle, HR Director Tracey Binion; employees directly responsible for running the housing

facility during the H-2B program including Daryl Snyder and Rhonda George; and WA Shouse who travelled to India for the testing process. Id. at ¶ 6; *See also* Exhibit F, Shelley Dep. 29:2-8, 53:9-11, 163:22-7.

Dr. Shelley did not limit herself to the documents produced in this litigation, but also examined other pertinent publicly available information. She reviewed the public Facebook pages of various Plaintiffs. Exhibit B at ¶ 6. She reviewed crime and housing data for the areas surrounding Signal's facilities. Id. at ¶ 6. She reviewed court cases and decisions in other cases with common patterns of allegations in which some individuals involved in events leading to this litigation can be linked to. Id. at ¶ 6. She reviewed the decision of the High Court of Delhi which returned Sachin Dewan's license for failure of any Plaintiff to bring a claim in India.[4] Id. at ¶ 6. She reviewed news coverage of the litigation, and public statements made by Saket Soni and Mark Massey. Id. at ¶ 6. Dr. Shelley also reviewed literature concerning human trafficking including documents published by the Southern Poverty Law Center over the past few years, US legislation, international treaties, and other key indicators of developing *ius cogens* regarding human trafficking. Id. at 9-10; Id. N.1-13, 18, 24, 49, 55, 60; *See also* Id. at Appendix I.

In sharp contrast to the data relied upon by Plaintiffs' proffered expert, Dr. Louise Shelley has considered a tremendous amount of information from numerous sources and has determined

---

[4] The decision of the High Court of Delhi recites the arguments urged by both parties and the facts of the case in detail over the course of 61 pages and 85 numerated paragraphs, and sets forth the question before it in the 86th paragraph. It then renders the reasoning for its decision in a single paragraph consisting of three sentences, very much in the style of French arrêts. *See generally* Eva Steiner, *French Law: A Comparative Approach* (Oxford University Press, April 30, 2010) at 181. "Taking into consideration the fact that till date no complaint or any action – Civil or Criminal – has been initiated by any of the workers against the petitioner, the order of cancellation would not commensurate with the gravity of the misconduct more particularly for non-maintenance of the records. The entire business of the petitioner has come to a standstill since 10.03.2008. Accordingly, the punishment awarded to the petitioner stands modified to the extent that petitioner shall be permitted to resume its business only after 10.11.2009, which would amount to suspension of work for a period of one year and eight months from the first suspension order i.e. 10.3.2008." WPC(C)No.5794/2008, M/s Dewan Consultants & Pvt. Ltd. V. Union of India & Ors., High Court of Delhi (2008) at ¶ 87.

herself what additional data or documents she wished to see. Shelley Dep. At 107:13-20 (noting she received everything she asked for).  The information she considered more than satisfies Rule 702's requirement that her, "testimony is based on sufficient facts or data" and easily meets the mere preponderance required. Fed. R. Evid. 702; *See* Mathis, 302 F.3d 448, 459-60.

### III.    DR. SHELEY'S EXPERT REPORT AND TESTIMONY ARE THE PRODUCT OF RELIABLE PRINCIPLES AND METHODS.

In evaluating reliability, courts consider several non-exhaustive factors including: "(1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community." Johnson, 685 F.3d 452, 459. Dr. Shelley is a Sociologist, and the relevant standards to which the reliability test should be applied is the field of Sociology. *See* Exhibit A at 1. The American Sociological Association defines sociology as, "the study of society", "a social science involving the study of the social lives of people, groups, and societies", "the study of our behavior as social beings, covering everything from the analysis of short contacts between anonymous individuals on the street to the study of global social processes",  "the scientific study of social aggregations, the entities through which humans move throughout their lives'", and "an overarching unification of all studies of humankind, including history, psychology, and economics". American Sociological Association, *What is Sociology?* (Oct. 22, 2014), http://www.asanet.org/about/sociology.cfm.

Dr. Shelley describes the general methodology for recognizing human trafficking as identifying important criteria and factors based on published research and case studies. *See* Exhibit B at ¶ 7; *See also* Shelley Dep. 175:19-182:15. In her work, Human Trafficking: A Global

Perspective, a standard textbook in the field as discussed *supra*, she discusses how human trafficking fits into and intersects with criminal networks as well as setting forth an analytical framework consisting of business models which provide criteria important to identifying not only the existence of trafficking, but specific subtypes. Louise Shelley, *Human Trafficking: A Global Perspective* (Cambridge University Press, 2010), Chapters 4-5. The factors and criteria identified by Dr. Shelley appear across the literature in the field. *See* Exhibit B, Appendix I, "Books Reviewed"; *See Generally* Exhibit A, "Publications"; *Also See Generally* Anthony DeStefano, *The War on Human Trafficking: U.S. Policy Assessed* (Rutgers University Press, 2007). She further identifies important distinctions which separate human trafficking from human smuggling. *Human Trafficking: A Global Perspective* p 94-111.

It is beyond dispute that Dr. Shelley's work and methodologies have been subject to exhaustive peer-review in her numerous publications thus easily demonstrating the reliability factors. *See* Johnson, 685 F.3d 452, 459. Further, "[t]hat the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were 'derived by the scientific method.'" Daubert, 43 F.3d 1311, 1317. The rigorous history of peer-review and acceptance of her principles and methods more than satisfies Rule 702's requirement that her, "testimony is the product of reliable principles and methods" and easily meets the mere preponderance required. Fed. R. Evid. 702; *See* Mathis, 302 F.3d 448, 459-60.

**IV.    DR. SHELLEY HAS RELIABLY APPLIED THE PRINCIPLES AND METHODS TO THE FACTS OF THE CASE IN AUTHORING HER EXPERT REPORT AND TESTIMONY.**

Consistent with the principles and methods laid out in her prior work and in the literature generally, Dr. Shelley reliably applies the criteria and factors which define human trafficking to facts in this litigation in order to form her opinions.

In her expert report, Dr. Shelley compares criteria and factors of trafficking to the facts present here. *See* Exhibit B. In one example, she cites criteria used by the U.S. State Department and identified as "Common Methods of Control of Victims by Human Traffickers". <u>Id.</u> at ¶ 47. As Dr. Shelley explains, the State Department separates these methods into three discrete categories: "Restriction of Movement, Harmful Living Conditions and Harmful Working Conditions". <u>Id.</u> ¶ at 47 (quoting U.S. Department of State, *Trafficking in Persons Report* (U.S. Department of State, 2012) at p 17). Dr. Shelley then proceeds to apply the criteria to the facts of the case here, and conduct a thoughtful and rigorous analysis. <u>Id.</u> at ¶ 48-58. She goes further in that analysis by adding additional criteria to the analysis from her own research, and applies it to the facts present in this case. <u>Id.</u> at ¶ 59.

Dr. Shelley further considers criteria from all spectrum of commentators including Southern Poverty Law Center's ("SPLC") previously published materials; the organization, of course, being the employer of some of Plaintiffs' Counsel in the related cases. <u>Id.</u> at ¶ 7. She even considers multiple versions from successive publications by SPLC and contrasts their criteria with other sources of human trafficking criteria that have normative value. <u>Id.</u> at ¶ 9-10; *cf. ius cogens* in **II**, *supra*. She continues her survey of human trafficking criteria and factors and applies them to the facts of the case methodically, and in great detail. <u>Id</u>, at ¶ 11 *et seq*.

Dr. Shelley also surveys many data from government agencies tasked with gathering statistics on human trafficking in the United States. Id. at ¶ 21-22. She identifies a statistical anomaly with regard to that data, specifically noting that such data does not account for the Signal cases in its trafficking figures giving rise to the inference that other agencies have discounted it from their consideration. Id. at 22.

Dr. Shelley even methodically addresses criteria raised by Plaintiffs' purported expert on human trafficking, addresses the validity of those criteria, and applies facts of the case with in-depth analysis. Id. at 25-39. She goes further, and identifies important criteria that Plaintiffs' purported expert fails to raise; criteria which are supported in the literature the said purported expert cites in her materials considered. Id. at 40-45. Dr. Shelley then applies the facts of the case to those criteria as well in great detail. Id. at 46-59.

That Dr. Shelley has consistently applied the principles and methods she has used her entire distinguished career, which are supported by her field, and well documented in the literature more than satisfies Rule 702's requirement that she, "has reliably applied the principles and methods to the facts of the case" and easily meets the mere preponderance required. Fed. R. Evid. 702; *See* Mathis, 302 F.3d 448, 459-60.

## V.    PLAINTIFFS ARGUMENTS

For the reasons that follow, arguments raised by the Plaintiffs in their "Motion to Exclude Dr. Louise Shelley as Expert" should be disregarded by this Court as unpersuasive and hyperbolic. As such, Plaintiffs' "Motion to Exclude Dr. Louise Shelley as Expert" should be denied in its entirety.

### 1.   *PLAINTIFFS CONTEND DR. SHELLEY'S METHODOLOGY IS NOT SCIENTIFICALLY VALID; THEY ARE IN ERROR*

"That the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were 'derived by the scientific method.'" <u>Daubert</u>, 43 F.3d 1311, 1317. As demonstrated, *supra,* in § **III**, Dr. Shelley's methodologies are not only well documented in the literature but have been well supported in her own peer-reviewed, "legitimate, preexisting research unrelated to the litigation". <u>Id.</u> at 1317. As demonstrated, *supra*, in § **IV**, she has also reliably applied that methodology to the facts here.

Plaintiffs take issue, *inter alia*, with Dr. Shelley's examination of trafficking statistics and data provided by government organizations, task forces, and agencies responsible for compiling such data. *See* R. Doc. 156 at 9. They question her review of photographic evidence of the Indian H-2B workers during the time periods pertinent to this litigation. <u>Id.</u> at 5. They take issue with her review of welding evidence specifically related to the inferior and unskilled nature of Hemant Khuttan's work, and then misrepresent the evidentiary record to make it appear Dr. Shelley is solely relying on her own personal experiences rather than her interviews with testing personnel at Signal. <u>Id.</u> at 5; *But See* Shelley Dep. at 167:7-167:25.

In supporting their broad inflammatory statements and boilerplate recitations, Plaintiffs' merely take issue with facts upon which Dr. Shelley bases her analysis and her interpretation thereof. This, of course, is not a valid basis to challenge her testimony. "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." <u>United States v. 14.38 Acres of Land</u>, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting Viterbo v. Dow Chemical Co., 826

F.2d 420, 422 (5th Cir.1987)). "Generally, the factual basis of an expert's opinion goes to credibility of the testimony, not admissibility." <u>Archer Daniels Midland Co. v. Aon Risk Servs.</u>, 356 F.3d 850, 858 (8th Cir. 2004) (citing <u>Bonner v. ISP Techs., Inc.</u>, 259 F.3d 924, 929 (8th Cir. 2001)). "An expert's opinion must be excluded only if it 'is so fundamentally unsupported that it can offer no assistance to the jury.'" <u>Id.</u> at 858 (internal citation omitted). Their arguments are properly held over to be made to the trier of fact, urging the weight with which her testimony should be received.

### 2. PLAINTIFFS ERRONEOUSLY ACCUSE DR. SHELLEY OF REGURGITATING SIGNAL'S POSITION

Plaintiffs argue that Dr. Shelley's testimony is mere regurgitation of Signal's positions and, for that reason, it would not be helpful to the trier of fact. R. Doc. 156 at 10-13. This is simply not true. Dr. Shelley's testimony is both informative, as to the nature of human trafficking she has surveyed in her research and in the literature generally, and a comparative analysis with the facts here. Some of what Dr. Shelley included in her expert reports is an opinion of what fits the fact patterns she sees here based upon her vast knowledge, experience, and expertise. For example, Plaintiffs criticize Dr. Shelley's assertions that some of the Indian H-2B workers committed fraud in India to bypass the skills testing. <u>Id.</u> at 12 (citing *David* Shelley Rep. at ¶ 17, 34). Instead of being a regurgitation, Dr. Shelley's opinions are prescient; after her report was filed, a plaintiff in *Joseph* confirmed fraud in BOTH the skills testing AND the medical checks. *See* Exhibit I, Iju James Dep. at 272:2-273:20, 278:17-280:2 (stating that he paid fees to Salimon to forge his medical test results and that he personally witnessed candidates paying extra fees to skip the skills testing). Generally, science is judged by its predictive power. Here, Dr. Shelley's opinions certainly hold true and would assist the trier of fact in understanding the complicated facts present in this case.

Plaintiffs also criticize Dr. Shelley for discussing Signal's well documented and award winning safety record. R. Doc. 156 at 12. They ignore the comparisons she makes between documented cases of trafficking where safety is not a concern (and indeed, victims are treated as "disposable people") and the situation here. Shelley Rep. at ¶ 40 *et seq*; Id. at N. 49.

The Plaintiffs spend many paragraphs and much toner discussing the facts upon which Dr. Shelley relies in forming her opinions. "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." United States v. 14.38 Acres of Land, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting Viterbo v. Dow Chemical Co., 826 F.2d 420, 422 (5th Cir.1987)). "Generally, the factual basis of an expert's opinion goes to credibility of the testimony, not admissibility." Archer Daniels Midland Co. v. Aon Risk Servs., 356 F.3d 850, 858 (8th Cir. 2004) (citing Bonner v. ISP Techs., Inc., 259 F.3d 924, 929 (8th Cir. 2001)). "An expert's opinion must be excluded only if it 'is so fundamentally unsupported that it can offer no assistance to the jury.'" Id. at 858 (internal citation omitted). Their arguments are properly held over to be made to the trier of fact, urging the weight with which her testimony should be received.

### 3. *PLAINTIFFS AVER PORTIONS OF DR. SHELLEY'S TESTIMONY WOULD BE IRRELEVANT TO THE HUMAN TRAFFICKING CLAIMS; IN FACT, THOSE OPINIONS GO TO THE HEART OF THE MANUFACTURED NATURE OF THE HUMAN TRAFFICKING CLAIMS IN THIS LITIGATION*

Plaintiffs take issue with Dr. Shelley's commentary on the changes to SPLC's publications which have either shifted or apply inconsistent criteria for identifying human trafficking. R. Doc. 156 at 13-14. In fact, Plaintiffs' Counsel appears personally vexed and affronted by her review and erudite criticisms of SPLC's work. Plaintiffs also take issue with Dr. Shelley's commentary on Saket Soni. Id. at 14. These issues relate to Dr. Shelley's discussion of the Chellen v. John Pickle

14

<u>Co.</u> case. They represent an important theory of the case that the jury is entitled to hear, and that Dr. Shelley is uniquely and eminently qualified to assist the jury in understanding. She is uniquely qualified in this way because only through the lens of her analysis did Signal come to understand the related patterns of allegations in these cases and the interconnectedness of actors involved in them – an observation we hereafter refer to as the "Pickle Pattern". The human trafficking claims in this case were manufactured for the twin purposes of (1) obtaining T or U visas for the Plaintiffs, and (2) advancing a political agenda to challenge the Government's temporary worker programs as violations of the 13th amendment.

### a. The Thirteenth Amendment Strategy

Signal contends the genesis of the human trafficking claims made in this case is Saket Soni, from the New Orleans Workers' Center for Racial Justice, who held meetings with the Indian H-2B workers in the Sacred Heart church's cafeteria. Kelleher Dep, 93:19-94:20. At these meetings, Saket Soni found exactly what he had been looking for, an opportunity to conduct a grand experiment in activism, an opportunity to test a theory.

> "On that basis and on the basis of many conversations, we created a theory, and the theory was, essentially, that the guest worker program, because it does not allow workers to switch employers, because it doesn't give you the right to quit and because it means that you will be deported when you're fired, is a violation of the 13th amendment.
>
> Recently, Jim Pope helped us articulate that argument for the U.S. government, and the U.S. government, in the past few weeks, in a watershed decision, agreed with us and granted protections to our members based on this intellectual

argument." Exhibit C, Transcript of speech found at: http://www.radioproject.org/2010/06/working-beyond-unions/ at 11:13-12:1.

Indeed, Mr. Soni articulates that the work of Jim Pope was "very instructive" in providing context to his efforts in "very intentionally" organizing metal workers in a sector where he "could try out this idea". Id. at 9:1-10:5. The work of Mr. Pope is, at base, a radicalized vision of organized labor as a 13th amendment argument. *See* Article: Labor's Constitution of Freedom,106 Yale L.J. 941 (1997) (arguing about the power of the 13th amendment in a labor context of "jurisgenerative insurgency"). This argument has been picked up, and applied to guest worker programs. "Viewed through a process theory lens, the Thirteenth Amendment compels Congress to revise guestworker statutes since guestworkers are unable to take advantage of democratic channels to combat employment practices that replicate slavery-like harms." Comment: Process Theory and Emerging Thirteenth Amendment Jurisprudence: The Case of Agricultural Guestworkers,41 U.S.F. L. Rev. 233 (2006) (citing James Pope's *Labor's Constitution of Freedom*, and further noting the topic itself was inspired by Prof. Maria Ontiveros, discussed *infra*).

James Pope's articulation of the 13th amendment being the meat of the labor movement found fertile ground with labor activists. Prof. Ontiveros, drawing on James Pope's work, lays out a, "strategic plan for using the thirteenth amendment" in pushing a radical labor agenda. *See* Article: A Strategic Plan For Using The Thirteenth Amendment To Protect Immigrant Workers,*27 Wis. J.L. Gender & Soc'y 133 (2012).* Touting the success of Saket Soni's organizations, she opines that he has successfully, "expanded accepted notions of the types of work relationships which could violate the Amendment." Id. at 151. She further contends, "Abusing and exploiting temporary workers has been **an inherent part** of 'guestworker' programs that do not permit portability regarding employment, have no path to permanent status, and include no labor

16

protections for workers." Id. at 151 (quoting Saket Soni et al, *Injustice for All: Workers' Lives in the Reconstruction of New Orleans*) (emphasis added). Prof. Ontiveros explicitly cites **this case**[5] as an example where activists "successfully used the Thirteenth Amendment in innovative and expansive ways" and identifies a 5 part roadmap for replicating these efforts. Id. at 152-3. The second step in this strategic plan is to, "[i]ncrease the use of 'T' and 'U' visas to expand the list of labor arrangements which violate the thirteenth amendment". Id. at 154.

### b.   The Pickle Pattern Provides a Template for Manufacturing Human Trafficking

As discussed, *supra*, Plaintiffs' criticize Dr. Shelley's reference to the Chellen v. John Pickle Co. case. R. Doc. 156 at 13-14. It is important to note that the Plaintiffs' own purported expert in human trafficking, Ms. Burke, lists the book *Nobodies* in her materials considered; this book devotes a full third of its pages to Chellen. *See* John Bowe, *Nobodies* (Random House, 2007) at p 87-158. In fact, Ms. Burke testified in Chellen and interviewed the plaintiffs in that case. *See* Chellen v. John Pickle Co., 446 F. Supp. 2d 1247, 1266 (N.D. Okla. 2006).

The allegations in the Chellen case follow a similar pattern to those advanced by the Plaintiffs here. There, Indian Welders were recruited in India, brought to the United States on temporary visas, the Chellen plaintiffs alleged inadequate housing, inadequate food, low pay, discrimination, false imprisonment, false promises, threats of deportation, high recruitment fees (borrowed from loan sharks at high interest rates), and even problems with the milk. *See* Id. at 1256; Id. at 1264; *See Nobodies* at 104-6. The Chellen plaintiffs went to a local church where they

---

[5] "The Alliance has also used the Thirteenth Amendment as part of its litigation strategy. For example, the Alliance represents a group of Indian workers brought to the United States to work for Signal International." *27 Wis. J.L. Gender & Soc'y 13, 152 (citing Saket Soni's efforts).*

met a preacher named Mark Massey who would later facilitate their exodus. *Nobodies* at 99-101;

*See also* <u>Chellen</u> 446 F. Supp. 2d 1247, 1262.

The EEOC also filed suit against the John Pickle Company. The lead trial attorney, Robert

Canino, described the <u>Chellen</u> defendant's lackluster defense as giving him an opportunity to win

their case, "in a way that could be used as a model for future, similar cases". *Nobodies* at 139. Mr.

Canino was also the individual who personally engaged Ms. Burke in that case. *See* Exhibit G,

Burke Dep. at 29:23-24. Mr. Canino first introduced Ms. Burke to Mr. Massey in Morgan City,

LA during the <u>Chellen</u> case. Burke Dep. at 118:19-119:25. There is an indication in the literature

that the <u>Chellen</u> plaintiffs received T or U visas connected to the case, and John Bowe explicitly

discusses the motivation behind exaggerating or lying about trafficking claims to obtain such.

*Nobodies* at 124-5 (also noting the calm and cool nature of the plaintiffs the author interviewed, in

contrast to victims he previously interviewed, and wondering if they were attempting to manipulate

him).

The trip he took during the <u>Chellen</u> case was not to be Mr. Massey's only stay in Morgan

City. According to *Nobodies*, Mr. Massey, "learned of an alleged scheme involving dozens of

Indian welders who were recruited to become steelworkers in Louisiana by a labor contractor

named Chad Chandler, owner of a firm called Falcon Steel Structures." *Nobodies* at 143. Mr.

Massey's extended stay would result in the <u>Abraham v. Singh</u> litigation. *See* <u>Abraham v. Singh</u>,

2005 U.S. Dist. LEXIS 17800, 2005 WL 2036887 (E.D. La. July 26, 2005). Again, the Pickle

Pattern of allegations appears. Mr. Massey facilitates the workers' exodus and their meeting with

lawyers to file a lawsuit. The <u>Abraham</u> Plaintiffs alleged high recruitment fees, false promises of

green cards, false promises of high pay, that they were provided with inadequate accommodations

and food, that they were threatened with deportation, and that their family in India was threatened. *See* <u>Abraham</u> R. Doc. 1; *See also* <u>Abraham</u> R. Doc. 22.

Mr. Massey and the Pickle Pattern are not the only commonalities <u>Abraham</u> shares with these litigations. One of the <u>Abraham</u> plaintiffs was named Muraleed Haran Nayapulli. <u>Abraham</u> R. Doc. 1. Strangely, a personal check made out to INDO-AMERI SOFT, LLC by Mr. Nayappuli was produced to Signal in discovery and subsequently used in the deposition of Jayachandran Nayappuli (a *Joseph* plaintiff). *See* Exhibit D, Personal Check of Muraleed Haran Nayapulli introduced as Exhibit 35 in the Deposition of Jayachandran Nayapulli. The check, dated June 14, 2004, shows that Muraleed Nayapulli's address was in Maryland. Jayachandran Nayappuli testified that Muraleed is his brother, and that Muraleed paid Jayachandran's initial payment for his recruitment through Dr. Rao. Jayachandran Dep. 248:17-251:5. A plaintiff in <u>Abraham</u>, a case fitting into the Pickle Pattern, in which Mr. Massey was involved, who came to the United States on a temporary Visa and is, apparently, still here (though he moved to Washington per Jayachandran), who alleged he was a trafficking victim and slave, who we may infer received a T or U Visa, wrote a personal check for $3,000 so his brother could participate in the same type of visa program he alleged trafficked him. His brother, then, files a lawsuit alleging he was trafficked, making allegations in line with the Pickle Pattern, and applying, and we may infer receiving, a T-Visa after filing a lawsuit. A lawsuit arising out of events that, as we shall see *infra*, Mr. Massey was involved in.

As discussed, *supra*, Saket Soni's agenda is to use the Thirteenth amendment as a weapon against temporary / guest worker programs which are at odds with his labor organizing efforts. In one of Mr. Soni's numerous public statements about this case and the events leading up to it, he explains that the first phone call he made when he got to New Orleans was to Mark Massey, and

that together they developed a plan involving guest workers along the gulf coast. *See* Exhibit E, Audio Transcript of Saket Soni at the Freedom from Fear awards at 4:1-4. Saket Soni and Mark Massey came to Signal, and inserted themselves into the events which lead to this litigation. Id. at 4:5-18.

Contrary to Plaintiffs' disparaging characterization of Dr. Shelley's contention, Dr. Shelley has identified a pattern of common allegations in cases where individuals present here were also involved. The common actors, in tandem with their radical labor theories and strategies, could cause a jury to conclude the claims in this case were manufactured or exaggerated for the twin purposes identified *supra*. Rather than irrelevant, as the Plaintiffs contend, Dr. Shelley's testimony will assist the trier of fact in understanding a very complicated factual pattern, which her expertise in human trafficking as well as organized crime are pertinent to. Further, Signal is entitled to argue to the jury that the Plaintiffs in this case made a Faustian bargain with a radical labor activist in which they surrendered themselves to the lies he placed in their mouths in order to reap the one prize they cherished more than any other – permanent residence in the United States.

## VI.   DR. SHELLEY'S TESTIMONY AND EXPERT REPORT DO NOT CONSTITUTE LEGAL CONCLUSIONS

Plaintiffs aver that Dr. Shelley makes a "staggering number of legal conclusions". R. Doc. 156 at 5. Despite this wild assertion, they identify four areas they contend, tenuously in most cases, she renders legal conclusions on: the standard by which trafficking should be judged under the TVPA (specifically taking issue with an analysis under a "severe form of trafficking" standard), her reliance on evidence regarding prior investigations of Signal by government agencies, agency, and hearsay. R. Doc. 156 at 5-8.

First, regarding agency, nowhere in Dr. Shelley's report does she conduct an analysis on agency or even mention the principle. Second, regarding hearsay, Dr. Shelley has used the word hearsay in its common meaning rather than legal, and could just as easily replace it with rumor. Shelley Rep. at ¶ 28. Third, regarding Dr. Shelley's reliance on the results of government investigations, Plaintiffs do not explain how she is deriving a legal conclusion as opposed to taking issue with the evidence she relied on. Of course, as discussed numerous times, *supra*, this goes to the weight and credibility the trier of fact applies to Dr. Shelley's testimony rather than its admissibility.

With regard to Plaintiffs' discussion of the TVPA standards for trafficking, this misplaced legal argument does not apply to Dr. Shelley as she is not offering testimony on what the legal standard is or applying it to the facts here. R. Doc. 156 at 6-7. Dr. Shelley discusses numerous legislations (both US and non-US), case studies, reports, and other sources of information which have **normative value** in understanding various societies' attempts to define and understand human trafficking. *See* Shelley Rep. at ¶ 7-10; *See also* Id. at Appendix I. Her testimony compares the situation here with cases of human trafficking based on her extensive knowledge, experience, and expertise.

Plaintiffs also accuse Dr. Shelley of, "contesting an imaginary debt bondage claim". R. Doc. 156 at 7. Plaintiffs have plead, exhaustively, facts akin to debt bondage to support their preposterous debt coercion theory. *See generally* all Plaintiff complaints in all cases. If it walks like a duck and quacks like a duck, Dr. Shelley is at least entitled to talk about family *Anatidae*[6]. *See* Exhibit J, Mowl Dep. at 133:21-134:4 (comparing the situation here to debt-bondage)[7].

---

[6] The family containing ducks, geese, and swans.
[7] 21   Q.   And when you say that, are you attempting

Finally, with regard to decision from the High Court of Delhi, this was discussed, *supra*, at footnote 4.

### 4. DR. SHELLEY DOES NOT TESTIFY REGARDING HER ASSESSMENT OF CREDIBILITY EITHER OF PLAINTIFFS OR WITNESSES

Plaintiffs aver that Dr. Shelley engages in an assessment of witness credibility in her testimony and that such testimony is not permitted. R. Doc. 156 at 14-15. As a preliminary matter, Plaintiffs cite no authority in this district or circuit that stands for this proposition. *See* Id. at 13 (citing only Schmidt v. MTD Prods.,2006 U.S. Dist. LEXIS 45275, 2006 WL 5127539 (E.D. La. July 5, 2006) in the aforementioned jurisdictions, which does not discuss witnesses, but instead appears to be discussing attorneys fees in an action involving a lawn mower without redhibition claims). None the less, we acknowledge they have cited authority in other circuits.

This argument is a red herring as Dr. Shelley is not offering credibility testimony. Plaintiffs rely on excerpts from Dr. Shelley's reports, but the purpose of an Expert's report is, *inter alia*, to provide, "a complete statement of all opinions the witness will express **and the basis and reasons for them**" (emphasis added) as well as, "the **facts or data** considered by the witness in forming them". Fed. R. Civ.P. 26(a)(2)(B). Plaintiffs' citations are nothing more than Dr. Shelley identifying her opinion, the facts and data she used in forming those opinions, the reasons, such as contradictions in statements and testimony of the Plaintiffs, for those opinions. Unless Plaintiffs'

---

22   to compare this with a debt-bondage situation?
23         MS. GRAUNKE:
24             Object to form.
25      A.  So, it's similar to a debt-bondage
 1   situation, but it's technically not debt bondage
 2   in that the employer did not hold the debt
 3   contract, but I would classify this as bonded
 4   labor.

Counsel intend to ask Dr. Shelley at trial whether she believes their clients are liars, their stated concern is merely a hypothetical that applies to any witness.

### VII.   DEWAN DEFENDANT'S ARGUMENTS

The Dewan Defendants argue for the exclusion of Dr. Shelley's testimony on several grounds. R. Doc. 159 at 4-8. First, the Dewan Defendants raise issues regarding reliability and regurgitation similar to those urged by the Plaintiffs. Id. at 6. These issues have already been discussed. *See* §§ **III**, **IV**, and **V(3)**, *supra*. The Dewan Defendants also raise issues as to relevance with regard to opinions related to the prior recruitments by Dewan. R. Doc. 159 at 6. The pre-Signal recruitment is clearly an issue in this case and thus relevant. The Dewan Defendants also raise issues about facts Dr. Shelley relies upon which they aver, "may not constitute admissible evidence at trial". Id. at 7. The admissibility of such facts or evidence is not properly challenged under Rule 702; even if specific evidence upon which her opinion was partially based were deemed inadmissible at trial, Dr. Shelley may still base her opinions on that evidence as an expert. *See* Fed. R. Evid. 703. The Dewan Defendants also raise issues regarding facts Dr. Shelley relies upon, but as discussed *supra*, that issue goes to weight and credibility assigned to her testimony by the jury rather than admissibility. *See* 14.38 Acres of Land 80 F. 3d 1077. *See also* Archer Daniels Midland Co., 356 F.3d 850, 858.

### CONCLUSION

As demonstrated, *supra*, Dr. Louise Shelley is eminently qualified to offer testimony in this case and her proposed testimony easily satisfies the Rule 702 requirements. There is no basis for excluding or limiting her proposed testimony. For the foregoing reasons, Plaintiffs' motion should be denied and the Dewan Defendants' motion should likewise be denied.

Dated October 31, 2014.

Respectfully submitted,

*/s/ Erin Casey Hangartner*_____
Erin Casey Hangartner, La. Bar No. 24768
Alan Dean Weinberger, La. Bar No. 13331
Hal D. Ungar, La. Bar No. 31344
Elham R. Rabbani, La. Bar No. 33322
Brian C. Roux, La. Bar No. 35298
Lance R. Rydberg, La. Bar No. 02089
Mitchell P. Hasenkampf, La. Bar No. 32870
Robert L. Keller III, La. Bar No. 35188
Kevin P. Maney, La. Bar No. 33956
Lauren Masur Davis, La. Bar No. 34669
HANGARTNER RYDBERG & TERRELL, LLC
701 Poydras Street, Suite 310
New Orleans, LA 70139
Telephone: (504) 522-5690
Facsimile:  (504) 522-5689
ehangartner@hanrylaw.com
aweinberger@hanrylaw.com
hungar@hanrylaw.com
erabbani@hanrylaw.com
broux@hanrylaw.com
lrydberg@hanrylaw.com
mhasenkampf@hanrylaw.com
rkeller@hanrylaw.com
kmaney@hanrylaw.com
lmasur@hanrylaw.com

And

Patricia A. Bollman, La. Bar 17563
James L. Cornblatt, (Pro Hac Vice)
Patricia A. Bollman,
A Professional Law Corporation
Post Office Box 13707
New Orleans, LA 70185
Telephone: (504) 218-5887
Facsimile: (504) 304-0890
patricia@bollmanfirm.com
cornblatt25@gmail.com

***Counsel for Signal International, L.L.C.
Signal International, Inc.,
Signal International Texas, G.P., and
Signal International Texas, L.P.***

24

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 31, 2014, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to non-CM/ECF participants.

*/s/ Erin Casey Hangartner*
ERIN CASEY HANGARTNER